907 P.2d 536

AMERCO, a Nevada corporation; U–Haul International, Inc., an Arizona corporation; and Amerco Business Consultants, Inc., an Arizona corporation, Plaintiffs–Appellants,

v.

Samuel W. SHOEN, M.D.; Mary Anna Shoen–Eaton and Timothy Eaton, wife and husband, Defendants–Appellees.

No. 1 CA–CV 92–0178.

Court of Appeals of Arizona, Division 1, Department E.

April 4, 1995.

As Corrected Aug. 29, 1995.

Review Denied Dec. 19, 1995.*

* Zlaket and Martone, JJ., of the Supreme Court, recused themselves and did not participate in the determination of this matter.

Cohen and Cotton, P.C. by Ronald Jay Cohen and Laura A. Hartigan, Richard M. Amoroso, Phoenix, for plaintiffs-appellants.

Gil Shaw, P.C. by Walter G. Shaw, Phoenix, for defendants-appellees.

## OPINION

FIDEL, Judge.

This suit by a corporation against participants in a failed takeover attempt is one of many battles in the ongoing Shoen family war for control of the U–Haul corporate empire. After a five week trial, the jury returned verdicts for defendants, rejecting claims that defendants had violated their fiduciary duty to the corporation. On appeal, the corporation attacks the trial court's jury instructions, evidentiary rulings, and refusal to permit the jury to consider nominal damages. We find no reversible error and affirm.

## I. BACKGROUND

A previous opinion describes the family and corporate strife that underlies this suit. *See Shoen v. Shoen*, 167 Ariz. 58, 804 P.2d 787 (App.1990). It suffices here to summarize facts fully developed there, supplemented as necessary to frame the issues of this case.

■ Plaintiff AMERCO, a Nevada corporation,[1] was established in 1969 as the holding company for the many companies that constitute the U-Haul Rental System ("U-Haul"), including plaintiffs U-Haul International, Inc., and Amerco Business Consultants, Inc. U-Haul was founded in 1945 by L.S. Shoen as an equipment rental company and is now one of the largest privately-held corporations in the United States.

When L.S. Shoen gave his twelve children most of AMERCO's stock, a sustained intra-familial struggle for control ensued. *Shoen v. Shoen* describes steps taken in July 1988 by a "directors' group," led by Edward J. Shoen ("Joe"), to consolidate control. These steps frustrated efforts by a "dissident stockholders' group," led by Joe's brother, Dr. Samuel W. Shoen ("Sam"), to trigger a breakup, restructuring, or takeover of AMERCO. This lawsuit concerns activities by Sam and other members of the dissident group in 1987 and 1988, when the directors' group held, but had not yet consolidated, control.

In November 1986, AMERCO shareholders forced L.S. Shoen into retirement, elected four of his sons to the AMERCO board, and named Joe as Chairman and Sam as President. Relations between the brothers soured; management became polarized; in February 1987, Sam resigned as president but stayed a board member till his ouster in September of that year.

In January 1988, the board established the AMERCO Board Advisory Committee, ostensibly as a forum to permit outside shareholders—primarily members of the Shoen family—to relay their advice and opinions to the board. The committee was chaired by Sam, and among its other members were his sister, defendant Mary Anna Shoen–Eaton ("Mary Anna"), and their brother Michael and father L.S. Shoen, formerly co-defendants in this suit.[2] The advisory committee was permitted some access to confidential corporate information.

On July 17, 1988, Sam, Mary Anna, Michael, their father, and other dissident shareholders met and agreed to attempt to wrest control of the corporation or explore a sale. Pursuant to federal law, the dissidents filed a public declaration of their agreement with the Securities and Exchange Commission on July 25, 1988. This "13–D disclosure statement" indicated the amount of AMERCO common stock that the dissidents collectively controlled; and it expressed their intention jointly to "maximize the value and liquidity of the AMERCO shares held by members of the group and, if feasible at an acceptable value, to investigate a possible sale, merger or other disposition of AMERCO, its assets or their interests in AMERCO."

The dissidents were outmaneuvered, however, by the directors' group, which took measures on July 24, 1988, to secure voting control over a majority of the stock. One such measure was to issue treasury stock to five loyal employees, each of whom was loaned the money to purchase the stock in exchange for a non-recourse note, and each of whom assigned the board a five year, irrevocable voting proxy for his shares.

---

1. Because AMERCO is a Nevada Corporation, and because this lawsuit concerns fiduciary relations between shareholders and management, where there is a choice of law to be made, the law of Nevada, the place of incorporation, should apply. *See, e.g.,* Restatement (Second) Conflict of Laws §§ 302, 309. The parties, however, have raised no choice-of-law issues in presenting this case. Nor have they focused in their citations on Nevada law. Nor have they suggested that Nevada law is unique respecting any of the issues presented in this case.

2. L.S. and Michael Shoen and their spouses were formerly defendants in this lawsuit. However, because claims against them were settled and dismissed with prejudice before trial, we have amended the caption to delete their names. Eva Berg Shoen, the wife of Sam, was also named as a defendant in this case. However, she was deceased by the time of trial, and we have deleted her name from the caption as well.

When the dissidents' group filed a lawsuit challenging the validity of the directors' acts of July 24, 1988, AMERCO responded with this separate lawsuit claiming that the dissidents had betrayed their fiduciary duty to the corporation.[3] Of plaintiffs' many claims of damage, some were the subject of an unappealed directed verdict by the trial court, others have been abandoned, and only three remain pertinent to this appeal.

### A. The Firestone Overture

The trial court permitted the plaintiffs to submit a claim to the jury that Sam damaged the corporation by failing to disclose a potentially profitable business proposition from Firestone. The evidence concerning this claim is primarily relevant to plaintiffs' appellate allegation that the trial court inadequately instructed the jury concerning a corporate fiduciary's obligations of disclosure.

On March 11, 1987, John Nevin, Chairman of the Board of Firestone, sent a letter to L.S. Shoen expressing an interest in business dealings with U–Haul:

> I continue to believe that some combination of U–Haul and Firestone resources might prove very advantageous to both of our companies. . . .
>
> It is also possible that the combination of resources could take the form of a joint venture or an acquisition by Firestone of some or all of Amerco's assets.

The parties dispute the extent to which the Firestone overture was made known to the AMERCO board. L.S. Shoen testified that he sent the letter to all of his children, four of whom were members of the board; plaintiffs contend he sent the letter to Sam alone. And though it is undisputed that Sam—no longer president but still a member of the board—mentioned Firestone's interest in AMERCO at a board meeting on April 6, 1987, the parties dispute the extent and sufficiency of his disclosure. Sam testified:

> I informed the board that I had received from my father this letter from Firestone that they were very interested in acquiring the company, and I wanted to know if the board wanted to pursue it.

The board of directors at that time other than myself were my brother Joe, my brother Paul, and my brother Jim. And they indicated to me quite clearly they had no interest whatsoever in pursuing it.

> I then said I would like to pursue this because I think a number of shareholders may very well be interested in this, is it okay if I meet with this man, Mr. Nevin. And they said fine.

AMERCO does not dispute this testimony, but asserts that Sam only mentioned Firestone's interest in an acquisition and withheld disclosure of Firestone's separate interest in a joint venture. When asked whether Sam ever mentioned Firestone's interest in a joint venture, Joe responded, "absolutely not."

On April 20, 1987, after conversations with Sam, Nevin wrote him that Firestone was no longer interested in pursuing the possibility of acquiring or joint-venturing with AMERCO. Sam testified that in their conversations, Nevin had expressed no interest in any relationship with AMERCO that did not include Firestone's friendly acquisition of at least 51% of AMERCO's stock. AMERCO maintained at trial, however, that because Nevin's March 11 and April 20 letters each referred to acquisition *or* joint venture, the joint venture overture constituted a separate corporate opportunity that Sam was obliged to disclose to the board. AMERCO also introduced evidence from which a jury might have concluded that a joint venture with Firestone—a sharing of outlets for Firestone sales and services and U–Haul equipment—could, if accomplished, have been highly profitable for AMERCO.

### B. The Preferred Stock Offering

The trial court also permitted plaintiffs to submit to the jury their claim that Sam and Mary Anna breached their fiduciary duty, while members of the AMERCO advisory committee in June 1988, by entering and publicizing the dissident shareholders' agreement to explore a sale or takeover of the corporation. Defendants were aware, as advisory committee members, that AMERCO

---

**3.** The dissidents' lawsuit was the subject of the interlocutory decision in *Shoen v. Shoen.*

was preparing a public preferred stock offering at about this time in an effort to raise capital for the corporation. And AMERCO introduced evidence that publication of the dissidents' activities and intentions forced abandonment of the stock offering by making it unlikely that the offering could succeed. The evidence concerning this claim is primarily relevant to plaintiffs' argument on appeal that the trial court inadequately instructed the jury concerning corporate fiduciaries' duty to place the corporation's interest before their own.

### C. The Laidlaw Allegation

For lack of evidence concerning damages, the trial court directed a verdict against plaintiffs on their claim that Sam, while still a member of the board, breached his fiduciary duty to AMERCO by withholding information that Laidlaw Transportation Company, a Canadian corporation, might be interested in acquiring AMERCO. Plaintiffs' Laidlaw allegation is pertinent on appeal to their claim that the trial court wrongly ruled nominal damages unavailable for breach of fiduciary duty.

The relevant evidence is that Sam was advised in June of 1987 by investment bankers from Shearson Lehman that their client Laidlaw wished to acquire a U.S. corporation and that Shearson Lehman had identified AMERCO as a potential candidate. Sam testified that he did not bring this possibility to the attention of the AMERCO board. Instead, he informed Shearson Lehman that the board had recently rejected an acquisition overture from Firestone but that Shearson Lehman, if interested, should contact the board directly and make a formal presentation.

Following a jury verdict for the defendants on those counts that had survived directed

verdict, formal judgment was entered on August 30, 1991. After moving unsuccessfully for a new trial, plaintiffs filed this timely appeal.

## II. NOMINAL DAMAGES

We first consider the trial court's refusal to instruct the jury that it must award at least nominal damages if it found that defendants had breached their fiduciary duties. The trial court denied plaintiffs the following instruction:

> When a corporate fiduciary breaches his or her duty, the corporation is entitled to some damages. Therefore, if you find that the evidence establishes that the defendants breached their fiduciary duties, you must award plaintiffs some amount of damages, even if you find those damages to be only nominal.

The court explained that it would decline to instruct on nominal damages for the same reason that had led it to direct a verdict against plaintiffs on their Laidlaw claim. The court reasoned that actual damages are an essential element of a cause of action for breach of fiduciary duty. Because plaintiffs had proved no actual damages from nondisclosure of the Laidlaw opportunity, the court directed a verdict on that claim; and it declined to instruct on nominal damages concerning the remainder of plaintiffs' claims.[4]

The trial court based its conclusion against nominal damages on a comparison of sections 874 and 907 of the Restatement (Second) of Torts. Restatement section 907 provides:

> Nominal damages are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages.

4. Plaintiffs' briefs do not identify the Laidlaw directed verdict as an issue presented for review. Plaintiffs merely add, in a short footnote to their discussion of the court's failure to instruct on nominal damages, that, for the same reasons that the court should have instructed on nominal damages, "the trial court should have permitted the Laidlaw claim to go to the jury." We do not regard this cursory parenthetical assertion as sufficient to frame the validity of the Laidlaw directed verdict as an issue presented for review.

See Ariz.R.Civ.App.P. 13(a)(5), 17B Ariz.Rev.Stat. Ann. ("A.R.S.") (appellant's brief shall contain "[a] statement of issues presented for review"); *Skousen v. Nidy*, 90 Ariz. 215, 217, 367 P.2d 248, 249 (1961) (a party who fails to present argument or authority to support a claim of error waives that claim); *Carrillo v. State*, 169 Ariz. 126, 132, 817 P.2d 493, 499 (App.1991) ("Issues not clearly raised and argued on appeal are waived.").

Comment (a) to section 907 explains, "If actual damage is necessary to the cause of action, as in negligence, nominal damages are not awarded." To determine whether actual damage is necessary to the cause of action for breach of fiduciary duty, the court looked to section 874, which provides:

> One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.

The trial court interpreted the reference to "harm resulting from a breach" in section 874 as a limitation of recovery to proven damages or harm. The court explained:

> [S]ection 874, which we are giving as part of [Jury Instruction] No. 13, has within the definition of the cause of action, harm resulting from a breach. And I am not surprised that it does because probably the most analogous cause of action would be a claim for negligence since one of the dimensions of the breach of fiduciary duty is the breach of care [ ] by a director to the corporation. So much like negligence, I think the question of harm is an implicit part of the cause of action.

Plaintiffs argue that the trial court was mistaken.

■ Because neither Arizona nor Nevada courts have decided whether nominal damages should be permitted for breach of fiduciary duty, we look for guidance to the *Principles of Corporate Governance: Analysis and Recommendations ("Principles")*, a recently published comprehensive study by the American Law Institute ("ALI") that qualifies for the deference we traditionally grant

to the Restatements of the ALI.[5] *See Dixon v. City of Phoenix*, 173 Ariz. 612, 621, 845 P.2d 1107, 1116 (App.1992) ("Arizona courts generally follow the Restatement in the absence of controlling Arizona authority."); *cf. People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 110 Nev. 78, 867 P.2d 1121, 1130–31 (1994) (looking to the Restatement for guidance); *Valentine v. Pioneer Chlor Alkali Co.*, 109 Nev. 1107, 864 P.2d 295, 297 (1993) (adopting the Restatement (Second) of Torts position on abnormally dangerous activities); *Home Savers, Inc. v. United Sec. Co.*, 103 Nev. 357, 741 P.2d 1355, 1356–57 (1987) (adopting Restatement (Second) of Contracts section 153).

The *Principles* do not provide for nominal damages in cases of breach of the fiduciary duty of fair dealing. Instead, the *Principles* require full compensation for actual damages and restitution of improper gain. The *Principles* place the burden of proving damages or unjust enrichment on the plaintiff. The relevant section provides in pertinent part:

> § 7.18 Recovery Resulting From a Breach of Duty: General Rules
>
> (a) ... a defendant who violates the standards of conduct set forth in ... Part V (Duty of Fair Dealing) ... is subject to *liability for the losses to the corporation* ... of which the violation is a legal cause, *and ... for any additional gains derived by the defendant* ... to the extent necessary to make equitable restitution.
>
> (b) A violation of the standards of conduct set forth in Part V[ ] is the legal cause of loss if the plaintiff proves that (i) satis-

5. The President's Foreword explains the ALI's decision not to name its corporate governance study a Restatement, even though the study represents an effort, comparable to a Restatement, "to rationalize and make coherent" the pertinent body of law:

> To some [observers] ... there appeared to be an inconsistency in applying the term "Restatement" to the Project when the product was interlaced with material in the nature of recommendations. Accordingly ... it was decided that one peripheral area of controversy could be avoided by changing the title.... All of the Institute's efforts to rationalize and make coherent a large body of law involve a heavy element of analysis. In this sense the term "analysis" fits the Project well, although

much of the content of the *Principles* consists of generalizing from existing case law, as in the case of any Restatement.

The term "Principles" in the title of the Project was not intended to denote a level of treatment different from that found in traditional ALI Restatements.... The term was not an expression of a purpose to deal in generalities. It was intended, rather, to signify that neither a model state corporation law nor a new Federal corporation law would be drafted. The Project was to focus on issues of governance responsibilities and to state existing or recommended ground rules—some to be implemented by the courts, some by legislatures, and some by corporations themselves. *Principles*, President's Foreword at XX–XXI.

faction of the applicable standard would have been a substantial factor in averting the loss, and (ii) the likelihood of injury would have been foreseeable to an ordinarily prudent person in like position to that of the defendant and in similar circumstances. . . .

(c) A plaintiff bears the burden of proving causation and *the amount of damages suffered by, or other recovery due to, the corporation or the shareholders* as the result of a defendant's violation of a standard of conduct set forth in Parts IV and V.

(Emphasis added.)

Subsection (c) refers not only to "damages suffered by the corporation," but also to "other recovery due." The comments, however, contemplate "other recovery due" only in the form of restitution of a defendant's improper gains.[6] In neither the section nor the comments nor the reporter's notes do the drafters provide for damages in the absence of actual damage or unjust enrichment.

We are satisfied that section 7.18 permits an adequate range of recovery for breach of corporate fiduciary duty.[7] We have no basis for concluding that, in the absence of actual damage or unjust enrichment, Nevada would encourage internecine corporate litigation by permitting a nominal damage claim.[8] These plaintiffs did not seek restitution damages, and the trial court properly instructed the jury on compensatory damages. In refusing to instruct on nominal damages, the trial court did not err.

## III. JURY INSTRUCTIONS

 We turn to plaintiffs' arguments that the trial court inadequately instructed the jury. When reviewing the denial of jury instructions, we consider the evidence in the light that favors the party who requested the instructions. *Pioneer Roofing Co. v. Mardian Constr. Co.*, 152 Ariz. 455, 462, 733 P.2d 652, 659 (App.1986). A trial court must instruct the jury on all valid legal theories framed by the pleadings and supported by substantial evidence. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982). However,

[t]he trial court . . . need not instruct on every refinement suggested by counsel. Instructions must be viewed as a whole and not piecemeal, the test being, upon the whole charge, whether the jury will gather the proper rules to be applied in arriving at the correct decision.

**6.** Comment (c) provides in pertinent part:

> Section 7.18(a) recognizes that the gains received by a defendant or an associate as a result of a breach may exceed or be distinct from the losses incurred by the corporation. It borrows the formulation of the Restatement of Restitution and describes the full measure of the defendant's liability as including that amount necessary to achieve "full restitution." This means that the defendant must account for gains derived by the defendant or an associate as a result of the breach, even though the corporation suffers no independent monetary loss. See Restatement of Restitution, § 151, Comment *c*. In some cases, the defendant will be required to account for gains that the corporation itself could not have realized, on the principle that the agent is liable to the principal for any gains realized through improper use of the latter's property.
> *Principles* § 7.18 cmt. (c).

**7.** Other courts have permitted plaintiffs unable to precisely prove actual damages to reach juries with claims for breach of fiduciary duty, sometimes describing these as "nominal damage" claims; but in these cases, either plaintiffs experienced actual damages insusceptible to reason-

able calculation or defendants had engaged in corporate plunder or diverted corporate opportunities to themselves. *E.g., L.A. Draper & Son, Inc. v. Wheelabrator–Frye, Inc.*, 813 F.2d 332 (11th Cir.1987) (plaintiff alleged that defendant had violated fiduciary duty by soliciting plaintiff's clients while employed by plaintiff); *In re Tri–Star Pictures, Inc., Litig.*, 634 A.2d 319 (Del. 1993) (plaintiffs alleged that the majority shareholders denied the minority class its right to cast an informed vote, diluted the voting power of the minority, and profited from a subsequent merger); *Caswell v. Jordan*, 184 Ga.App. 755, 362 S.E.2d 769 (1987) (plaintiff alleged that defendant director had "plundered and looted" corporate assets). In this case, by contrast, plaintiffs neither claimed nor proved that defendants diverted corporate opportunities to themselves and should disgorge some captured benefits belonging to the corporation. And plaintiffs did not seek an instruction to the effect that imprecision in the amount of damage should not preclude recovery so long as actual damages were proved.

**8.** Nevada expressly rejected the award of "mere nominal damages to vindicate a technical right" in product liability actions. *Werner v. Shoshone Coca–Cola Bottling Co.*, 91 Nev. 286, 535 P.2d 161 (1975).

*Pioneer Roofing,* 152 Ariz. at 462, 733 P.2d at 659 (citing *Hallmark v. Allied Prod. Corp.,* 132 Ariz. 434, 646 P.2d 319 (App.1982)).

In keeping with our obligation to view the instructions as a whole, we print the pertinent portions of the trial court's charge.

■ A fiduciary relationship is a relationship in which one party is under a duty to act for or to give advice for the benefit of the other upon matters within the scope of the relationship.

A fiduciary relationship is one of trust requiring the fiduciary to act with the highest degree of honesty, loyalty, good faith and fair dealing.

■ The relationship[s] between a corporation and its directors and officers, employees, agents and consultants or advisors are fiduciary relationships.

■ One standing in a fiduciary relationship with another is subject to liability to the other for harm resulting from a breach of duty imposed by the fiduciary relationship.

■ A corporation, as such, has no interest in its outstanding stock, or in dealings by its officers, directors or shareholders with respect thereto.

■ A director has no duty to disclose his stock dealings to the corporation.

■ A director does not necessarily breach any duty owed to the corporation by promoting a change of management.

■ Directors and officers are under no duty to follow management blindly, but rather they are obliged to exercise their own best judgment on behalf of the corporation.

■ Directors and officers owe their fiduciary duties to the corporation only, not to management.

Against the backdrop of these given instructions, we consider the instructions that, according to plaintiffs, were erroneously denied.

*A. Duty to Subordinate Personal Interests*

Appellants assert that the trial court erred in refusing to give a series of instructions to the effect that a corporate fiduciary must promote the interest of the corporation and must subordinate personal interests where they clash:

[P19] [9] A director of a corporation is required to actively promote the general interests of the corporation and its stockholders.

[P20] A corporate fiduciary has an absolute duty to place the best interests of the corporation and its stockholders above his or her own self-interest.

[P22] A corporate fiduciary must exert all reasonable lawful efforts to ensure that the corporation is not deprived of any advantage to which it is entitled.

■ We need not dwell on P20. When the trial court characterized this instruction as too rigid and absolute a statement of law, plaintiffs did not quarrel with his assessment, but instead asked the court to "give a special type of modified instruction" combining P19 and P20. The court, however, had no obligation to rewrite plaintiffs' instructions. *See Catchings v. City of Glendale,* 154 Ariz. 420, 425, 743 P.2d 400, 405 (App.1987) ("The trial court is not required to rewrite a proffered instruction so that it accurately reflects the law."). Moreover, the gist of all three instructions was adequately carried by the trial court's instructions that a corporate fiduciary must "act for the benefit of" the corporation in "matters within the scope of the relationship" and "act with the highest degree of honesty, loyalty, good faith and fair dealing." To the extent that P19, P20, and P22 accurately reflected the law, they were simply elaborations or refinements of the court's instructions, and the court had discretion to reject them. *See Pioneer Roofing,* 152 Ariz. at 462, 733 P.2d at 659.

*B. Disclosure of Corporate Opportunity*

■ We next consider instructions that plaintiffs offered concerning the fiduciary duty to disclose corporate opportunities:

9. To distinguish plaintiffs' requested jury instructions from the trial court's given instructions, both of which are numbered sequentially in the record, we will refer to plaintiffs' requested instructions as "P19," etc.

[P17] A breach of fiduciary duty occurs when:

1. There is a fiduciary relationship; and

2. The fiduciary, who is under a duty to make a full and truthful disclosure of all material facts, fails to do so.

When a fiduciary fails to make a full and truthful disclosure of all material facts he is liable for all damages flowing from his misrepresentation or concealment.

[P21] A director's fiduciary capacity requires complete and prompt disclosure of all matters known to the director affecting the interests of the corporation and its stockholders.

[P24][A] A corporate fiduciary has an obligation to deal honestly and fairly with his or her corporation. The duty of candor or disclosure is one of the elementary principles of fair dealing. [B] Disclosure is a fundamental fiduciary duty.

[P25][A] A corporate fiduciary must promptly and completely disclose to the corporation any potential opportunity that the fiduciary learns of, which is within the corporation's area of interest. [B] It is immaterial whether the corporation would have or could have taken advantage of the opportunity. [C] Similarly, it is irrelevant that the fiduciary did not personally profit from his failure to disclose the opportunity.

Our first comment on these instructions is to note their redundancy and overbreadth. Faced with repetitive, overstated variations on a single theme, the trial court permissibly declined to undertake the editing that plaintiffs' counsel had neglected to perform. *See Catchings,* 154 Ariz. at 425, 743 P.2d at 405.

P17 correctly defines as a subcategory of breach of fiduciary duty a fiduciary's failure to fully and truthfully disclose any material facts that he has a duty to disclose. But P17 is incomplete standing alone and must be considered in conjunction with instructions that define "material facts" and explain what circumstances trigger a duty to disclose. Plaintiffs did not offer an accurate definition of "material facts." [10] Instead, P21 defined the duty to disclose as encompassing "all matters known ... affecting the interests of the corporation and its stockholders." This overbroad definition was properly rejected by the court.

P24 was likewise properly rejected as it is merely repetitive of other instructions.

In P25 plaintiffs attempted to define the circumstances that trigger a duty to disclose, but the trial court rejected P25 as an effort to apply "the classical corporate opportunity doctrine" to a set of facts that did not support its application. The "corporate opportunity doctrine" prohibits fiduciary usurpation of a corporate opportunity. It requires a fiduciary who learns of a corporate opportunity to disclose it to the corporation before seeking to appropriate the opportunity for himself. *See Principles* § 5.05.

■ As the trial court correctly commented, this is not such a case; plaintiffs have never contended that defendants attempted to appropriate the Firestone or Laidlaw opportunities for themselves. Instead, plaintiffs attempted to expand the doctrine beyond the context of fiduciary usurpation by asserting in P25C that it is irrelevant whether "the fiduciary did not personally profit from" the undisclosed opportunity. The trial court pointed out that plaintiffs had failed to supply any authority that supported this extension.[11] The court concluded that

---

10. *Principles* § 1.25 defines "Material Fact" as follows:

A fact is "material" if there is a substantial likelihood that a reasonable person would consider it important under the circumstances in determining the person's course of action.

11. Plaintiffs argue on appeal that this case should be governed by *DSG Corp. v. Anderson,* 754 F.2d 678 (6th Cir.1985), describing *DSG* as "on all fours" with this case. It is not. The Sixth Circuit there concluded that general instructions on fiduciary duty had not sufficed and that the trial court had erred by not informing the jury of more specific duties, including the duty of disclosure. *Id.* at 682. But *DSG* is a classic case of usurpation, involving employees who, before leaving their employer, and while assisting the company to prepare a bid on a contract to be awarded, submitted an undisclosed competing bid to capture the contract for themselves. *DSG* thus gives no support to defendants' effort to expand the corporate opportunity doctrine beyond the context of fiduciary usurpation.

specific disclosure instructions need not be given:

> I am of the view that the question of whether ... the defendants had [a duty to] disclose[ ] anything in connection with this case is probably a component of whether or not the defendants breached their duty of loyalty. So the instructions will be the generalized statement of loyalty....

The trial court's approach is supported by the *Principles. Principles* section 5.05 provides a detailed restatement of disclosure requirements in cases of fiduciary usurpation of corporate opportunity. But in cases that lack the element of attempted usurpation, the *Principles* treat nondisclosure as merely a means of breaching the duty of care:

> Section 5.05 imposes upon directors or senior executives the obligation to offer a corporate opportunity to the corporation only if they wish to pursue it for their personal benefit, because the essential vice prohibited by § 5.05 is the taking of an opportunity for one's own benefit which should rightfully be offered to the corporation. However, directors or senior executives may under certain circumstances be liable for breach of the duty of care if they allow an opportunity to be foregone that they are charged with pursuing for the corporation. For example, if a senior executive is charged with the official duty to pursue an opportunity on behalf of the corporation and fails to do so, liability may be imposed under § 4.01(a) [12] for failure to perform the undertaking of due care to the corporation.

*Principles* § 5.05(a) cmt. We adopt the approach taken in the *Principles* and affirm the trial court's conclusion that its general duty instruction sufficed.

DSG is also distinguishable because there the trial court's general instructions tended to mislead the jury, inappropriately suggesting that acts of the defendants were permissible, even though contrary to the interests of their employer, as long as their employment was terminated before the contract was awarded. As we discuss *infra*, the instructions in this case, unlike those in *DSG*, were neutral, gave plaintiffs ample room to argue their theory of the case, and did not suggest a conclusion contrary to law.

Moreover, if we are mistaken and the trial court should have expressly defined disclosure as an element of the general duty of care, its failure to do so is not reason to reverse. Only prejudicial errors in instructions warrant reversal. *Bliss v. Treece,* 134 Ariz. 516, 520, 658 P.2d 169, 173 (1983). Prejudicial instructions are those which, by statement or omission, support a resolution that is harmful to the complaining party and contrary to law. *DeMontiney v. Desert Manor Convalescent Ctr.,* 144 Ariz. 6, 11, 695 P.2d 255, 260 (1985); *see also DSG Corp. v. Anderson,* 754 F.2d 678, 682–83 (6th Cir. 1985).

The trial court instructed the jury that defendants owed the corporation the "highest degree of honesty, loyalty, good faith and fair dealing." Plaintiffs contended that Sam deliberately declined to inform the board of a joint venture possibility with Firestone because so profitable a venture by AMERCO would have impeded his takeover attempt. Plaintiffs had ample leeway in the court's instructions to argue their theory that so deliberate, self-serving, and harmful a nondisclosure—if established by the evidence— fell short of the "highest degree of honesty, loyalty, good faith and fair dealing." None of the court's instructions suggested a legally erroneous resolution of this point. If the jury did not accept plaintiffs' contention, it was not for lack of a more specific instruction. Because the given instructions gave plaintiffs sufficient leeway to argue their theory of the case, the omission of disclosure instructions did not amount to prejudicial error. *Petefish By and Through Clancy v. Dawe,* 137 Ariz. 570, 577, 672 P.2d 914, 921 (1983) (no reversible error when an instruction, even though imperfect, gives appellant "ample room to argue" theory of the case).

**12.** *Principles* § 4.01 defines the general duty of a corporate director or officer "to perform [his] functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances."

## C. Takeover Attempt

■ We separately consider instruction P26, which plaintiffs offered to convey their theory that defendants were obliged to disclose or forego their impending takeover attempt to avoid damaging AMERCO's preferred stock offering.

[P26][A] Corporate fiduciaries must order their conduct so as to place the performance of their fiduciary duties above their own purely personal concerns. Therefore, whenever a fiduciary has a personal interest which is adverse to that of the corporation, the fiduciary must act with the utmost fairness and good faith in guarding the interests of the corporation.

[B] Whenever a fiduciary possesses information and the withholding of that information will damage the corporation, it is the fiduciary's duty to fully disclose the potentially damaging information to the corporation.

■ This instruction was susceptible to misconstruction. Directors must "exercise their own best judgment" on behalf of a corporation and its stockholders and are "under no duty to follow management blindly." *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 378 (2d Cir.1980) (citations omitted). Directors may promote takeover of a corporation and have no duty to reveal takeover plans to management. *Treadway Cos., Inc. v. Care Corp.*, 490 F.Supp. 668, 684 (S.D.N.Y. 1980), *aff'd in relevant part*, 638 F.2d 357. An accepting view of takeover attempts is rooted in securities law and public policy, which "does not exist for the benefit of protecting incumbent management from hostile takeover attempts." *Id.; see Wellman v. Dickinson*, 475 F.Supp. 783, 835 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir.1982).

The trial court's instructions were balanced and correct. In instructions 18 through 22, the court informed the jury that corporate fiduciaries owe a duty to the corporation, not to management, may promote a change in management, and must exercise their own best judgment on behalf of the corporation. *See Treadway*, 638 F.2d at

378–79. Subject to these limitations, the trial court's general instruction 15 gave plaintiffs ample room to argue that, in order to give the corporation the "highest degree of honesty, loyalty, good faith and fair dealing," defendants were obliged to place the corporation's interest before their own. Because the trial court's instructions "viewed as a whole and not piecemeal" gave the jury "the proper rules to be applied," *Pioneer Roofing*, 152 Ariz. at 462, 733 P.2d at 659, permitted plaintiffs reasonable room to argue their case within those rules, *Petefish*, 137 Ariz. at 577, 672 P.2d at 921, and did not suggest a conclusion contrary to law, *DeMontiney*, 144 Ariz. at 11, 695 P.2d at 260, the trial court did not err by rejecting P26.

## D. Shifting the Burden of Proof

■ Plaintiffs claim the trial court erred by refusing to instruct the jury that Sam bore the burden of proving his actions were fair to the corporation. Plaintiffs cite *Shoen v. Shoen*, in which we stated:

Once there is a prima facie showing that a director is personally interested in a corporate transaction, the business judgment rule does not apply, and the burden shifts to the director to show that the decision with respect to a particular transaction is fair and serves the best interests of the corporation and the shareholders.

167 Ariz. at 65, 804 P.2d at 794. We need not address whether the burden of proof should have been shifted in this case because plaintiffs failed to preserve this issue for appeal.

The trial court required the parties to submit proposed jury instructions with the joint pretrial statement two months before trial began. In neither the pretrial statement nor their jury instructions did plaintiffs propose shifting the burden of proof. As best we can determine, plaintiffs first raised the issue at the close of the evidence during the settling of jury instructions. When the trial court accepted a "business judgment" instruction offered by defendants,[13] plaintiffs responded:

**13.** The court instructed, "Directors and officers are under no duty to follow management blindly,

but rather they are obliged to exercise their own best judgment on behalf of the corporation."

[I]f we are going to apply *Treadway* [14] and say that business judgment or best judgment of the director is relevant in this case ... let's apply it completely. Let's shift the burden to Dr. Shoen in this case, just as the court in *Shoen v. Shoen* said is required to do when you have got a case where you are attempting to assert as a defense the business judgment rule.... [W]e would ask that the court modify the instructions so that ... there be an instruction along the line which we have prepared, if the court would like to look at it.

Although counsel referred to a modification "along the line which we have prepared," no proposed burden-shifting instruction appears in the record. Nor did the court respond to the question whether it wished to look at what plaintiffs had prepared. Instead, without further discussion of burden-shifting, the court and counsel moved on to other instructions. Later, however, in taking up the subject of burden of proof, the court stated without objection that neither party had offered a burden of proof instruction. The court proposed to instruct as follows:

The plaintiff has the burden of proving, one, that a defendant breached a fiduciary duty; and two, that plaintiffs suffered damages; and three, the defendants' breach was a cause of plaintiff's damages; and four, plaintiff's damages.

Plaintiffs replied that they had "no objection to the way the court has stated it." They did not renew their request for a burden-shifting instruction, and none was given.

■ Even if an instruction is inadequate or improper, a party may waive objection to the instruction if it fails to object to the final form of the instruction and fails to offer an acceptable alternative. *Bradshaw v. State Farm Mut. Auto Ins. Co.*, 157 Ariz. 411, 419, 758 P.2d 1313, 1321 (1988); *see also* Ariz. R.Civ.P. 51(a), 16 Ariz.Rev.Stat.Ann. ("A.R.S."). Because plaintiffs offered no objection to the court's burden-of-proof instruction, their present objection is waived.

**14.** 638 F.2d 357.

## IV. EVIDENTIARY RULINGS

### A. Bad Acts

■ We last consider plaintiffs' evidentiary challenges, beginning with their argument that the trial court wrongly allowed evidence of insider "bad acts." Although plaintiffs allege multiple instances of such evidence, their complaints are exaggerated and unsupported by the record. Sifting through the record, we find only two questions that warrant discussion. Defense counsel, when cross-examining Joe, asked:

Did you ever call your sister, Mary Anna Shoen–Eaton, at any time in 1988 and tell Mary Anna Shoen–Eaton that you were packing a gun?

\* \* \* \* \* \*

[D]id you ever tell Sam that you and your brother Mark and a man named Daryl Hambe went out to the home of a man named Dennis Saben and held a gun at his head and took $6,000 cash out of his place, plus a number of paintings? Did you ever tell Sam about that?

Plaintiffs objected pursuant to Rule 403, Arizona Rules of Evidence, 17A A.R.S., that the questions were irrelevant or were exceeded in probative value by their capacity for unfair prejudice. The trial court overruled these objections upon defense counsel's assurance that he had a good faith basis for the questions. The witness answered both questions in the negative.

In their later motion for mistrial, plaintiffs asserted that the questions amounted to an improper effort to impeach Joe and Mark or attack their character in violation of Rules 404(b) and 608, Arizona Rules of Evidence. The court responded that it had not permitted the questions for impeachment or to prove bad character but rather as relevant to defendants' explanation of their motivation to change management or leave AMERCO. *See* Ariz.R.Evid. 404(b) (bad act evidence may be admissible to prove motive or intent).

Although the questions had the potential to prejudice or distract the jury, they were also probative of defendants' motivation to enter their agreement to explore a corporate take-

over or sale. The trial judge must balance probative value and prejudice, and we will not reverse absent a clear abuse of discretion. *State v. Taylor,* 169 Ariz. 121, 126, 817 P.2d 488, 493 (1991). Here defendants' motivation was highly material to plaintiffs' allegations of breach of fiduciary duty, and we defer to the trial court's implicit judgment that the questions had sufficient probative potential to stand.

### B. Opinion Testimony by Sam Shoen

[17] We next consider plaintiffs' argument that the trial court erred by allowing Sam to give opinion testimony concerning the failure of the preferred stock offering. Plaintiffs had introduced expert testimony by Stanley Friedman, a financial consultant with the accounting firm of Coopers & Lybrand, concerning the damage to AMERCO from the failure of its preferred stock offering. In response, over plaintiffs' objection, defendants offered the contrary opinions of Sam. Plaintiffs argue on appeal that admission of Sam's testimony violated Rule 26(e)(1), Arizona Rules of Civil Procedure, and *Kott v. City of Phoenix,* 158 Ariz. 415, 763 P.2d 235 (1988).

Rule 26(e)(1) provides:

A party is under a duty seasonably to supplement the [discovery] response with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify and the substance of the person's testimony....

Although plaintiffs had been notified that Sam would testify at trial, he had not been identified as an expert; nor had the substance of his opinions been disclosed.

Plaintiffs rely on *Kott* for the proposition that it is error to permit a party to elicit expert opinion testimony from a witness at trial if the party has identified the witness only as a factual witness, not an expert. *Kott* indeed stands for this general proposition, but is distinguishable from this case. *Kott* was an accident claim against a city concerning negligent maintenance of a public road. The trial court permitted the city to offer an investigating officer's opinions on causation,

though the city had not identified the officer as an expert witness before trial. Reversing a defense verdict, our supreme court determined that the officer's testimony was expert testimony that should have been disclosed. *Id.* at 418, 763 P.2d at 238. The officer, however, was not a party, in contrast to Sam, who is the primary defendant in this case. And Sam was not testifying as an independent investigator but as a former AMERCO director and president with specific knowledge concerning the claims against him. As the trial court explained,

This is not an independent expert, not somebody hired to come in and render formal opinions. Instead, this is the defendant, who is intimately connected with the factual nexus out of which the claim arises, and would be in a position to attack, analyze or otherwise give his opinion to this jury about the plaintiff's claims for damages against him.

And the fact that he otherwise would be in a position to render expert opinion under Rule 703 should not handicap him or preclude him from doing what any other party could do in any civil case.

For the reasons given by the trial court, Sam's opinions were properly received in evidence in this case.

### C. The Jelenko Memorandum

█ We next consider plaintiffs' argument that the trial court erred by precluding them from introducing a document into evidence that, according to plaintiffs, contained admissions that defendants intended to cause corporate unrest and instability and to destroy the preferred stock offering. The document was an internal memorandum by Martin Jelenko, an investment banker with Bear Stearns, whom the dissidents had approached to explore whether Bear Stearns could assist their effort to pursue a corporate takeover or sale. Jelenko directed his memorandum to associates at Bear Stearns to prepare them for a follow-up meeting to discuss the terms upon which Bear Stearns might undertake the project. The memorandum provided in part:

Sam and Mary Anna are proposing to retain Bear Stearns to represent them in an effort to cause the company and the Board to either put the company up for sale or to buy them out. . . . Our role would be to represent Sam and Mary Anna and perhaps other siblings who would sign on in an effort to wrest control of the Board or to cause the company to buy them out. This might entail a proxy fight among the family members and/or litigation and/or a tender offer at a heavily discounted price by Bear Stearns and/or a group of substantial institutional investors organized by Bear Stearns with a view toward a subsequent reorganization or sale of the company in whole or piecemeal.

\* \* \* \* \* \*

[A] real analysis of the value of this company is a complex and considerable undertaking and is the first order of business for the engagement.

\* \* \* \* \* \*

We have advised the clients that once this analysis is completed, we will jointly develop a strategy on how to proceed, which as noted above, may involve a proxy fight, tender offer, litigation or other pressure which may result in the sale or disposition of their interest in the company.

Our basic mandate is to bring to the company and the unsophisticated siblings who own it an outside source of professional advice and to "stir the pot" to produce the desired results.

The trial court excluded the memorandum as inadmissible hearsay, rejecting plaintiffs' arguments that the memorandum was admissible under the Arizona Rules of Evidence as defendants' admission through an authorized spokesman under Rule 801(d)(2)(C), as a statement by defendants' agent under Rule 801(d)(2)(D), and as a business record under Rule 803(6). The trial court concluded that the exploratory relationship between Bear Stearns and the defendants had not advanced sufficiently to render Bear Stearns an agent or authorized spokesman whose statement or business record was admissible against defendants under the cited rules. Though

plaintiffs and defendants debate the validity of this ruling on appeal, we resolve the issue on other grounds.

We first observe that the Jelenko memorandum was largely cumulative. Defendants did not deny at trial that they had joined to explore the alternatives of taking over AMERCO, causing the company to be sold or reorganized, or causing the company to buy them out. Nor did they deny that they had approached Bear Stearns and others toward such ends. To the contrary, Sam testified as much, multiple exhibits made the point, and defendants' counsel so indicated from opening statement on. Thus, to the extent that the Jelenko memorandum established these points, it was merely cumulative, and its exclusion did not prejudice the plaintiffs.

What plaintiffs sought from the memorandum was not Jelenko's summary of these undisputed points but rather his statement that Bear Stearns' "basic mandate [was] . . . to 'stir the pot' to produce the desired results." Plaintiffs interpret this comment as an admission of defendants' disruptive intentions and bad faith. But in the absence of testimony by Jelenko, there is no foundation for that construction.[15] One cannot tell from the face of the document whether Jelenko was quoting one of the defendants or employing his own metaphor to describe a strategy that he proposed to offer the defendants. Nor can one tell from the face of the document what Jelenko meant by the metaphor he employed. In the absence of such foundation, the jury could only have speculated to unravel the thrust of this comment, and defendants could not have cross-examined the document. *See* Ariz.R.Evid. 803(6) (evidence inadmissible "to the extent that portions thereof lack an appropriate foundation"). Accordingly, because the document was largely cumulative and residually speculative and lacking in foundation, the trial court properly declined to admit it into evidence.

### D. Hearsay

We last consider plaintiffs' argument that the trial court erred by permitting Sam, on direct examination by his counsel, to re-

---

**15.** Neither side listed Jelenko as a witness, and neither side called him at trial.

count the out-of-court opinions of Bill Coogan, an investment banker with First Boston, concerning why AMERCO's preferred stock offering had failed. Over plaintiffs' hearsay objection, the court let Sam describe a telephone conversation in which Coogan attributed the preferred stock offering failure to multiple factors including publicity concerning Shoen family discord, the outsiders' lawsuit, the insiders' issuance of unauthorized stock, the insiders' adoption of a "poison pill" provision, and a dispute over First Boston's underwriting commission. This testimony was hearsay indeed. But two weeks earlier, over *defendants'* hearsay objection, the trial court had permitted Joe, on redirect examination by his counsel, to recount his telephone conversation with Coogan, in which Coogan had reportedly attributed the preferred stock offering failure to "the signing of the napkin agreement" (the dissidents' agreement to pursue a sale or takeover of the company).

When plaintiffs interposed a hearsay objection to defendants' effort to invoke Sam's conversation with Coogan, the court inquired of defendants' counsel:

THE COURT: What do you say to that, Mr. Johnson?

DEFENDANTS' COUNSEL: That the identical thing was done by the other side.

THE COURT: That's interesting. Why don't you both come up.

After an unrecorded bench conference, the objection was overruled.

Coogan was not a witness. The out-of-court statements that Sam attributed to Coogan, like those that Joe earlier attributed to Coogan, were offered "to prove the truth of the matter asserted." *See* Ariz.R.Evid. 801(c). We know no hearsay exception that would accommodate Sam's testimony or Joe's. In allowing defendants to walk the trail that plaintiffs blazed, the trial court applied a precept more venerable than the hearsay rules—the ancient rule of "sauce for goose." [16]

We do not suggest that trial courts should balance a mistaken admission of hearsay by

extending equal hearsay opportunity to the other side. But it is inconceivable in this case that the evidence in question affected the verdict. After five weeks in trial, this jury was no more likely to be swayed by Sam's partisan attribution of opinions to the absent Mr. Coogan than by Joe's. On this point, as on those that precede it, we find no reversible error.

The judgment of the trial court is affirmed.

JACOBSON, P.J., and NOYES, J., concur.

---

16. The Oxford English Dictionary 128 (1933) cites Collier *2d Def. Short View* 37 (1700) as its earliest source for the proverb, "What's sauce for the goose is sauce for the gander."