NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

SUNFLOWER ADULT DAY CARE CORPORATION, *Plaintiff/Appellant*,

*v.*

AHCCCS ADMINISTRATION, *Defendant/Appellee*.

No. 1 CA-CV 18-0162
FILED 2-7-2019

---

Appeal from the Superior Court in Maricopa County
No. LC2017-000186-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

---

COUNSEL

Hymson Goldstein Pantiliat & Lohr, PLLC, Scottsdale
By Eddie A. Pantiliat, Lori N. Brown
*Counsel for Plaintiff/Appellant*

Broening Oberg Woods & Wilson, Phoenix
By Jathan P. McLaughlin, John C. Quinn
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Kenton D. Jones joined.

---

**C R U Z**, Judge:

¶1   Sunflower Adult Day Care Corporation ("Sunflower") appeals the termination of its Provider Participation Agreement ("PPA") with the Arizona Health Care Cost Containment System ("AHCCCS"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2   In 2005, Sunflower began operating an adult day care service for AHCCCS. A few years later, Sunflower began providing non-emergency transportation for AHCCCS members ("Members")—for example, by providing rides to and from Sunflower's facility, to doctor appointments, or to Alcoholics Anonymous ("AA") meetings. Sunflower provided these services to AHCCCS pursuant to its PPA, the most recent iteration of which was executed in June of 2014. Until 2015, Sunflower provided these services for AHCCCS without incident.

¶3   In June of 2015, Sunflower subcontracted with Hannah General Services, LLC ("Hannah") to provide the same non-emergency transportation that Sunflower provided for Members under the PPA. Sunflower did not notify AHCCCS of this agreement.

¶4   On October 2, 2015, a contractor for Hannah, Quinn Montoya, was providing non-emergency transport to Members pursuant to Sunflower's PPA. Montoya picked up Member J.B. to transport him to an AA meeting. J.B. got into the van with a gallon-sized bottle of vodka—he had been drinking before the pick-up, and he continued to drink in the van. Although Montoya gave J.B. numerous admonitions to stop consuming alcohol in the van, Montoya allowed J.B. to continue to ride in the van with the open bottle of vodka. Montoya again picked up J.B. following the AA meeting, and drove to the Flagstaff mall. Upon arriving at the mall, J.B. stated he was going to take a nap; shortly thereafter, Montoya saw that J.B.'s face was turning blue. Montoya began administering CPR to J.B. and ordered another Member to drive the van to

the hospital; J.B. died. Sunflower did not notify AHCCCS of the incident, and AHCCCS did not become aware of J.B.'s death until Flagstaff Police Department contacted them six days later.

¶5            Around this same time, AHCCCS was conducting an audit of Sunflower. The audit was precipitated by two events in August of 2015: (1) AHCCCS received an anonymous referral that Sunflower drivers received prior authorizations for and were reporting more miles than could reasonably be driven; and (2) AHCCCS' fee-for-service division discovered, during its internal audit, evidence of fraudulent activity on many trip sheets submitted by Sunflower.

¶6            On September 1, 2015—following its discovery of fraudulent trip sheets—AHCCCS ordered Sunflower to submit copies of its records. On September 17, Sunflower began requesting reversal of previously-filed fraudulent claims. Sunflower claims that, until it began compiling the trip sheets en masse to comply with AHCCCS' records request, it was unaware of the fraudulent claims reflected within many of the sheets. This was "because it received trip sheets by fax from the . . . drivers and submitted the trip sheets to AHCCCS via scan one at a time."

¶7            Because of the incident with J.B. and the fraudulent trip sheets, AHCCCS terminated Sunflower's PPA on October 20, 2015. During the appeals process that followed, Sunflower raised its subcontract with Hannah as a defense; AHCCCS thereafter added to its argument that Sunflower further violated the PPA by subcontracting its responsibilities to outside parties without providing notice to AHCCCS.

¶8            Sunflower appealed the termination of its PPA, and after a hearing, the Administrative Law Judge (the "ALJ") recommended in June of 2016 that AHCCCS reverse its decision. Despite the ALJ's recommendation, AHCCCS upheld the termination in a July 2016 Director's Decision. Sunflower appealed to the superior court, and the court—finding that the Director wrongly assigned the burden of proof to Sunflower—vacated the Director's Decision and remanded it for reconsideration under the correct burden of proof.

¶9            On remand, the Director again affirmed termination of Sunflower's PPA, and Sunflower again appealed to the superior court. This time, however, the court affirmed the Director's Decision on all grounds—the subcontract, the health and welfare of its Members, and the fraudulent trip sheets. Accordingly, the court concluded that substantial

evidence supported the second Director's Decision, it "was not contrary to law, was not arbitrary or capricious, and was not an abuse of discretion."

¶10    Sunflower timely appealed to this Court. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1).

## DISCUSSION

¶11    Sunflower asks us to determine whether the Director erred in affirming the termination of Sunflower's PPA. *See Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶ 12 (App. 2009) (stating the Court of Appeals "engage[s] in the same process as the superior court when we review its ruling affirming an administrative decision"). Sunflower alleges three separate grounds for error, claiming:

(1) Sunflower did not violate the PPA by failing to disclose its subcontract with Hannah, because there was no disclosure requirement;

(2) The singular incident of J.B.'s death was insufficient to find Sunflower endangered the health or welfare of AHCCCS Members; and

(3) Sunflower acted within the PPA's so-called "overpayment clause" when it discovered and reversed its claims under the fraudulent trip sheets.

Each of these three claimed violations, considered independently, represents grounds sufficient to terminate the PPA; we consider each alleged violation and Sunflower's responding arguments in turn.

¶12    We review an administrative agency's decision to determine whether it was "illegal, arbitrary, capricious or . . . an abuse of discretion." *Ariz. Cannabis Nurses Ass'n v. Ariz. Dep't of Health Servs.*, 242 Ariz. 62, 65, ¶ 8 (App. 2017) (citation and internal quotations omitted). We do not reweigh the evidence, *St. Joseph's Hosp. v. AHCCCS*, 185 Ariz. 309, 312 (App. 1996), but determine only whether substantial evidence supports the administrative decision, *Smith v. Ariz. Long Term Care Sys.*, 207 Ariz. 217, 220, ¶ 14 (App. 2004). We review *de novo* questions of law, including interpretation of contracts, statutes, or regulations. *Am. Power Prods., Inc. v. CSK Auto, Inc.*, 242 Ariz. 364, 367, ¶ 12 (2017) (contracts); *Ballesteros v. Am. Standard Ins. Co. of Wisc.*, 226 Ariz. 345, 347, ¶ 7 (2011) (statutes);

*Gutierrez v. Indus. Comm'n of Ariz.*, 226 Ariz. 395, 396, ¶ 5 (2011) (regulations).

I.      The Hannah Subcontract

**¶13**        Sunflower contends that its subcontract with Hannah, executed without the knowledge or consent of AHCCCS, did not provide AHCCCS grounds to terminate the PPA.  The PPA states in paragraph 6 that the "Provider shall comply with all federal, state and local laws, rules, [and] regulations," and in paragraph 31 that "AHCCCS has the right to terminate . . . this Agreement upon twenty-four (24) hours['] written notice when . . . the Provider fails to comply with this Agreement or with Federal and State laws and regulations."  AHCCCS does not claim that the Hannah subcontract violates a specific provision of the PPA; rather, AHCCCS' position is that the subcontract violates Arizona regulations.

**¶14**        The parties dispute the applicability of Arizona Administrative Code ("A.A.C.") § R9-22-714(B)(1), which provides:

> [AHCCCS] . . . shall reimburse a provider for a service furnished to a member only if:
>
> 1. The provider *personally furnishes* the service to a specific member.   For purposes of this Section, services personally furnished by a provider *include*:
>
>    a. Services provided by medical residents or dental students in a teaching environment; or
>
>    b. Services provided by a licensed or certified assistant under the general supervision of a licensed practitioner in accordance with [other A.A.C. provisions].

(Emphasis added.)  Specifically at issue is the meaning of "personally furnishes" and "include," as italicized above.  AHCCCS claims that Sunflower violated this provision of the A.A.C. when it sought reimbursement for services that it did not "personally furnish," but were instead provided by Hannah, an unregistered and unapproved subcontractor.

**¶15**        Sunflower responds that A.A.C. § R9-22-714(B)(1) does not apply to Sunflower, as a transportation provider.  Sunflower argues that the definition of "personally furnishes" is limited exclusively to those

services listed in subsections (a) and (b) by the use of the word "include," as opposed to "include, but are not limited to."

¶16 We interpret regulations according to their plain meaning, *Hourani v. Benson Hosp.*, 211 Ariz. 427, 431, ¶ 7 (App. 2005) (stating we apply the plain meaning of statutes if it "is clear and unambiguous"); *Kimble v. City of Page*, 199 Ariz. 562, 565, ¶ 19 (App. 2001) ("The same principles of construction that apply to statutes also apply to administrative rules and regulations."), and to "yield a fair and sensible meaning," *Kimble*, 199 Ariz. at 565, ¶ 19. The interpretation Sunflower would have this Court adopt is neither plain nor sensible.

¶17 "[U]nless the context otherwise requires," we will apply the definition of "include" as found in A.R.S. § 1-215. In Arizona, "'[i]ncludes' or 'including' means not limited to and is not a term of exclusion." A.R.S. § 1-215(14). We do not interpret a regulation in a vacuum; rather, we consider the regulatory scheme as a whole, and will "presume that the legislature does not include [regulatory] provisions which are redundant, void, inert, trivial, superfluous, or contradictory." *Cf. Hourani*, 211 Ariz. at 431, ¶ 7 (internal quotations omitted) (discussing statutory interpretation).

¶18 Sunflower's interpretation of A.A.C. § R9-22-714(B)(1)—limiting AHCCCS to reimbursing only for services provided by students in teaching environments, or by licensed or certified assistants under supervision of licensed practitioners—is untenable. The regulation includes those listed in subsections (a) and (b) to expand the services beyond those "personally furnished" by the provider—because, as AHCCCS rightly points out in its brief, those enumerated are unable to independently receive AHCCCS Provider IDs.

¶19 We therefore hold that A.A.C. § R9-22-714(B)(1) applies to the services provided by Hannah and billed to AHCCCS by Sunflower. Sunflower did not "personally furnish" those services to Members, because Sunflower employees—all of whom it concedes it was required to disclose to AHCCCS—did not provide the transportation services; rather, they were provided by Hannah pursuant to a subcontract of which AHCCCS was unaware. Finally, Sunflower points to no other provision of the A.A.C. under which those services may have qualified for payment from AHCCCS, and our research uncovers none.[1] Accordingly, the

---

[1] We note that A.R.S. § 36-2904 explicitly provides for payment to subcontractors of AHCCCS *Contractors*. However, under neither the

Director did not err in finding that Sunflower's reimbursement requests for services provided by Hannah violated the A.A.C., and therefore paragraph 6 of the PPA.

II.     The Health or Welfare of AHCCCS' Members[2]

**¶20**      Sunflower next argues that the Director erred by upholding AHCCCS' termination of the PPA on the ground that Sunflower endangered the health or welfare of Members.  Paragraph 31 of the PPA provides AHCCCS the authority to terminate the PPA when "AHCCCS deems the health or welfare of a member is endangered."   This determination is fact specific—neither party points to any legal standard for determining when Member health or welfare is endangered, and such factual determinations are beyond the purview of this Court.  We review only to determine whether substantial evidence supports the Director's conclusion.  *Gaveck*, 222 Ariz. at 436, ¶ 11 ("The court must defer to the agency's factual findings and affirm them if supported by substantial evidence.  . . . even if the record also supports a different conclusion.") (internal citations omitted).

**¶21**      We also note the singular nature of the object of this particular PPA clause: "a member."   Sunflower improperly frames the contractual standard, *Am. Power Prods., Inc.*, 242 Ariz. at 367, ¶ 12 (citations omitted) (stating we review interpretation of contracts *de novo*); we therefore disagree with Sunflower that this "one aberrational incident is not [a] sufficient basis on which to conclude" it endangered the health or welfare of a Member.

---

definition of Contractor provided in A.R.S. § 36-2901(3), nor the PPA, is Sunflower a Contractor; it is a *Provider*.  Sunflower's status as a non-Contractor is clear upon review of section A of the PPA, which authorizes payment for services provided by Sunflower to Members who are and are not "enrolled with a Contractor."

2      In its response brief, AHCCCS addresses Sunflower's previously-raised alternative argument that the subcontract with Hannah shielded Sunflower from any liability regarding J.B.'s death.  Because Sunflower does not argue this issue in its brief, it is waived.  *See* ARCAP 13(a)(7); *AMERCO v. Shoen*, 184 Ariz. 150, 154 n.4 (App. 1995) (stating failure to develop argument or present supporting authority on appeal waives issue).

¶22        J.B. was a Member.   At the time of J.B.'s death, he was aboard a van which provided transport, purportedly pursuant to Sunflower's PPA.  Montoya, Hannah's contract-driver of the van, violated numerous contract policies that inarguably endangered J.B.'s health or welfare: permitting J.B. to board the van with and drink from a gallon-sized container of vodka, driving Members to multiple unapproved locations other than the AA meeting, failing to immediately call 9-1-1 and wait for EMT services upon discovering J.B.'s incapacitation, and having another Member drive the van to a hospital.

¶23        Given the events and circumstances surrounding J.B.'s death, we cannot say the Director erred in deeming Sunflower endangered "the health or welfare of *a member*."   Substantial evidence supports the Director's findings.  We affirm on this ground.

III.     The Fraudulent Trip Sheets

¶24        The final issue is whether the PPA's overpayment clause excuses Sunflower's receipt of overpayment based on the fraudulent trip sheets, or whether the fraudulent trip sheets provided AHCCCS sufficient grounds to terminate the PPA.   We review *de novo* issues of contract interpretation.  *Am. Power Prods., Inc.*, 242 Ariz. at 367, ¶ 12 (citations omitted).

¶25        The overpayment clause of the PPA states:

> Pursuant to Section 6402 of the Affordable Care Act of 2010, if Provider [Sunflower] has received an overpayment, Provider shall report and return the overpayment to AHCCCS . . . within 60 days of the date the overpayment was identified.

As outlined in paragraph 13, *supra*, the PPA provides AHCCCS the right to terminate it if Sunflower violates any of its provisions, or any federal or state law.  Stated plainly: If Sunflower violates the overpayment clause, AHCCCS may terminate the PPA with 24 hours' notice.

¶26        Sunflower argues that it complied with the terms of the overpayment clause—in other words, that it reported the overpayment within 60 days of "discovering" it.  But even a generous reading of the facts of this case do not place Sunflower's activities beneath the umbrella of the overpayment clause.  After discovering evidence that numerous trip sheets were fraudulent—specifically, traces of whiting out and refilling certain blanks, and sheets with identical odometer readings, miles

8

travelled, and patient names—AHCCCS' fee-for-service department flagged Sunflower's activities for investigation. As part of its investigation, AHCCCS ordered Sunflower to resubmit its trip sheets en masse. Only at this point did Sunflower claim to realize the fraudulent nature of the trip sheets and attempt to reimburse AHCCCS.

¶27        We can hardly state the issue with Sunflower's argument more clearly than the superior court:

> While [the overpayment clause] of the PPA provides that a provider who receives an overpayment shall report and return the overpayment within 60 days of its identification, Sunflower did not report the overpayments. Instead, AHCCCS identified the pattern of false claims through its own audit. A plain reading of the PPA shows that the overpayment clause was meant to allow Sunflower to correct overpayments on its own initiative, not wait for AHCCCS to find problems and allow a grace period for repayment.

¶28        To interpret the repayment clause as Sunflower proposes and reverse on this issue would be tantamount to green-lighting the commission of fraud upon AHCCCS by service providers in Arizona until caught. The repayment clause is not intended to benefit the provider who rectifies fraud only upon its discovery by AHCCCS, or even after AHCCCS commences an audit; rather, it intends to encourage providers who independently and proactively discover and report mistakes made in good faith, by providing them a means to preserve their PPA. We simply cannot interpret the clause to save providers who address what appear to be intentional false submissions only after the submissions are discovered by AHCCCS. To do so would nullify the PPA's termination clause as it relates to the overpayment clause. *See Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 478, ¶ 56 (App. 2010) ("It is a cardinal rule of contract interpretation that we do not construe one term of a contract to essentially render meaningless another term.").

¶29        Furthermore, as noted above, the PPA provides AHCCCS the right to terminate the PPA if the Provider violates state law. As the superior court pointed out, Arizona law forbids a person from presenting, or causing to be presented, a claim for a service "the person knows or has reason to know is false or fraudulent." A.R.S. § 36-2918(A)(2). At the very least, the record shows that Sunflower had reason to know the trip sheets were fraudulent and could have easily discovered such fraud. In fact, by

its own admission, Sunflower readily discovered the fraud upon compliance with AHCCCS' records request simply by looking at the trip sheets side-by-side. We hold there was no abuse of discretion in finding that Sunflower violated both the repayment clause of the PPA and Arizona law.

## CONCLUSION

¶30  The Director did not err in upholding termination of the PPA. We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA