652 P.2d 1017

MASTER RECORDS, INC., a corporation, Plaintiff/Appellant,

v.

Bernard BACKMAN and Virginia Backman, husband and wife, and Arizona, Inc., a corporation, Defendants/Appellees.

No. 15840.

Supreme Court of Arizona, En Banc.

Sept. 23, 1982.

Himelrick, Gildar & Hilpert by Richard G. Himelrick, Scottsdale, for plaintiff/appellant.

Van Baalen Law Offices by Richard T. Weissman, Phoenix, for defendants/appellees.

FELDMAN, Justice.

Appellant, Master Records, Inc., filed suit against appellee, Backman, a former officer and director of appellant, alleging breaches of Backman's fiduciary duties. The trial court, sitting without a jury, rendered judgment against Master Records, and this appeal followed. Findings of fact and conclusions of law were waived, and none were made. This court has jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

The pertinent facts, viewed in the manner most favorable to uphold the judgment, *Neal v. Neal,* 116 Ariz. 590, 592, 570 P.2d 758, 760 (1977), are as follows.

Appellee Backman was employed by Rovinsky & Co. as a securities salesman. In April of 1977, Elliot Rovinsky, president of Rovinsky & Co., approached Backman with the possibility of pursuing a business venture for the sale of master tapes[1] as tax shelter investments.

The concept of the venture was that Backman, who had experience in the recording business, would obtain master tapes from artists and recording studios; these would be marketed as tax shelter investments, primarily to customers of Rovinsky & Co. Backman would continue in the employ of Rovinsky & Co. as a securities salesman, but would also be in charge of the day-to-day operations of Master Records. Rovinsky was to provide the capital. Backman testified that he basically believed he would be working for Mr. Rovinsky and was unaware he was later made an officer or director. Nevertheless, after Backman agreed to the venture, Master Records, Inc. was incorporated and came into existence on June 20, 1977. Mr. Rovinsky and Mr. Backman were the sole officers and directors of Master Records.

Contemporaneously with the incorporation of appellant, Backman and appellant entered into an employment contract. Its operative provisions read:

1. Bernard Backman will acquire master recordings from local artists which are of acceptable quality and new for Master Records.

2. From the records acquired by Bernard Backman for Master Records a 20% commission will be paid on the net profits after expenses and before salaries on a monthly basis.

3. Bernard Backman will coordinate and run the daily operations of Master Records.

The contract was signed by Rovinsky and Backman, as president and vice-president of appellant, respectively. Rovinsky requested Backman to sign a covenant not to compete, but Backman refused, and no such covenant was put in the contract.

Pursuant to this arrangement, Backman contacted recording studios and purchased master tapes for Master Records, which were then sold to investors. Backman's business relationship with Rovinsky soon deteriorated. According to Backman, whose testimony we must now accept, he had a meeting with Rovinsky some time in mid-July. At this meeting, Rovinsky informed Backman that he was not pleased with Backman's past performance and felt Backman was not suited for the business conducted by Rovinsky & Co. Backman was given to understand he had no future

---

1. A master tape is an original recording. The master is used to produce recordings which are then retailed to the public. A purchaser of a master tape from appellant would acquire an exclusive license to sell and distribute any reproductions made from the master. A major incentive for the purchase of master tapes from appellant was their tax shelter potential.

with Rovinsky & Co. Rovinsky also intimated that Backman's future with Master Records depended on Backman's subsequent performance. Backman also testified that at a later meeting in July he told Rovinsky that he wanted to produce new tapes and was precluded from doing so by Rovinsky's insistence that Backman not pay more than $250.00 for the tapes Backman purchased from the studios. In addition, Backman felt that a master stamper[2] should be sold with the master recordings so as to market a "finished product" capable of generating a profit for the investors. Backman feared that unless the product Master Records was selling had the actual potential of generating profit, the tax shelter investment would not withstand scrutiny by the tax officials.

As a result of his dissatisfaction with Rovinsky, Backman claims that he told Rovinsky he would leave Master Records and would do no more than "wind-up" the business already commenced in July. Backman formed his own company, Artzona, which he incorporated contemporaneously with the July meeting with Rovinsky. On September 5, 1977, Rovinsky sent a letter to Backman, requesting his resignation from Master Records. Backman responded by a letter dated September 12, 1977, in which he made his resignation effective September 9, 1977, the date Backman received Rovinsky's letter. Soon after, Master Records filed the present action against Backman.

## COMPETING BUSINESS

During August of 1977, Backman, through Artzona, engaged in what he termed "substantially the same business" as Master Records. The record reflects that five sales of master tapes were made by Artzona during this month which resulted in gross profits of $16,000. Appellant contends that Backman was a director and an officer of Master Records during this month and, therefore, the sales constituted a breach of Backman's fiduciary duties to appellant.

2. A master stamper is a mechanical device (a stamp or a plate) used to press records. The

■ In reviewing the propriety of Backman's actions, we first note that because neither party requested findings of fact pursuant to Rule 52(a), Rules of Civil Procedure, 16 A.R.S., and the trial court made none, we must presume that the trial court found every fact necessary to support its judgment, and we must sustain those presumptive findings if they are justified by any reasonable construction of the evidence. *Neal v. Neal,* 116 Ariz. at 592, 570 P.2d at 760.

■ Turning now to the merits of this action, we are first guided by the well established rule that

> In Arizona a director of a corporation owes a fiduciary duty to the corporation and its stockholders.... This duty is in the nature of a trust relationship requiring a high degree of care on the part of the director.... [A] director does not breach his fiduciary duty so long as he acts honestly and in good faith and breaches no specific duty owing to the corporation....
>
> ....
>
> ... [Furthermore] [i]t is not the fact of engaging in a competing business that gives rise to liability. It is the additional circumstances which show a course of conduct of causing deliberate injury to the business and reputation of the corporation that supports a finding of bad faith and resulting liability.

*Atkinson v. Marquart,* 112 Ariz. 304, 306, 541 P.2d 556, 558 (1975).

■ Thus, to hold Backman liable for breach of his fiduciary duties toward appellant, appellant had to show, first, that Backman was a director of appellant at the time he engaged in a competing business through Arizona and, second, that Backman engaged in a course of conduct causing deliberate injury to Master Records' business and reputation.

Upon a reasonable construction of the evidence, we find support for the trial court's presumptive finding that appellant

master tapes sold by appellant are used to make master stampers.

did not meet its burden of showing that Backman was a director and officer of Master Records during August, when the five sales at issue were made by Artzona. Appellant contends that Backman's resignation from Master Records was effective in September, when he submitted his written resignation to Rovinsky. Backman testified, however, that he told Rovinsky that he would no longer procure or deliver any more master tapes for Master Records after July; that he would merely "wrap-up" the existing orders which had come in during July. Backman's version is supported by the testimony of Ms. Schuler, a client of Rovinsky & Co. She had a meeting with Mr. Rovinsky on August 1, 1977, at which time she inquired about Backman, with whom she had usually done business. According to Ms. Schuler, Rovinsky told her that he had let Backman go and also said "[s]omething about he's going into business for himself."

The record therefore is sufficient to support the trial court's presumptive findings that during the month of August Backman had effectively resigned from Master Records, that Rovinsky was aware of such resignation and, therefore, Backman did not owe any fiduciary duties to Master Records after the month of July. The fact that Rovinsky requested and Backman provided a written letter of resignation in September was seemingly a mere formality which did not alter the fact that an effective resignation had taken place earlier. The general rule in this regard has been stated as follows:

> In the absence of express provision, a resignation need not be in any particular form. It may be either oral or in writing, though putting a resignation in writing is the more orderly and proper mode of procedure; but whatever method is adopted it must clearly show an intent to resign. In any event, whether a director has resigned is a question of fact to be determined from the circumstances of each case.

2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 346 (rev.perm.ed. 1982) (footnotes omitted).

Furthermore, "[n]o notice of the resignation to creditors of the corporation or to the public is generally necessary. And no acceptance or record of the resignation is necessary." *Id.* § 347. And, finally,

> In the absence of charter or statutory provisions to the contrary, the resignation of a corporate officer becomes complete, and his office becomes vacant the moment the resignation is made to the proper officer or body ... and it is not necessary that the resignation be accepted or that it be entered on the corporate minutes or that someone be elected to take his place, in order to make the resignation effective.... Accordingly, the officer's resignation is complete when it is tendered. It is not necessary for him to do more ... nor may his motives or intention in resigning be litigated or inquired into upon the trial, because no reasons need be assigned by the officer for resigning. The basis of ... [this rule] is that where a director thus resigns, the inaction or refusal of a board of directors should not impose upon him a future liability or responsibility which he does not desire to undertake.

*Id.* § 349. Here, Backman testified that he had never been informed that he was a director of the corporation, that it was a "shell," that in July he had notified Rovinsky that he would wind-up and leave. There was corroborating evidence from a customer that Rovinsky "got the message" and knew that Backman had left the company's employ as of August 1.

For the reasons stated above, we uphold the trial court's presumptive finding that Backman was not an officer or director of Master Records during August of 1977. Therefore, after August 1, Backman owed no fiduciary duties to Master Records and was free to engage in a competing business through Artzona. We need not reach the questions of whether Master Records met its burden of showing that Backman, while a director and officer of Master Records, realized "secret profits," appropriated business opportunities or engaged in a course of

conduct causing deliberate injury to appellant's business and reputation because appellant alleged Backman's breach of fiduciary duties only with respect to the five Artzona sales consummated in August.

## MISAPPROPRIATION OF CORPORATE ASSETS

In its sales of master recordings, appellant used a form of sales contract prepared for it by legal counsel. Appellant expended $2,000 in legal fees for this purpose. Backman admitted using the same form for the sales documents which he had printed for Artzona, substituting only Artzona's name for appellant's name in the documents. Appellant contends Backman's use of the documents constituted an actionable misappropriation of appellant's corporate assets for which it is entitled to recover the $2,000 expended in their preparation.

■ At the outset, we recognize that

The fiduciary relation of the corporate officers to the corporation ... imposes upon them the obligation to serve the purpose of their trust with fidelity, and forbids the doing of any act by them, or by any one of them, by which the assets of the corporation are wrongfully diverted from corporate purposes. There is little or no controversy as to the liability in general of directors or other corporate officers for misappropriation, diversion or conversion of corporate assets. Such a liability exists and may be enforced by the corporation ....

3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1102 (rev.perm.ed. 1975) (footnotes omitted).

■ Nevertheless, upon examination of the record before us, we agree with the trial court's presumptive finding that appellant failed to show that a misappropriation of a "corporate asset" occurred in this case. Here, appellant failed to show that its form contract was indeed an asset of the corporation. An asset, corporate or otherwise, is generally defined as "property of any kind, whether real or personal, tangible or intangible, legal or equitable, which can be made available for the payment of debts." *E.g.,*

*Harris v. United States,* 431 F.Supp. 1173, 1178 (E.D.Va.1977); *accord In re Bichel Optical Laboratories, Inc.,* 299 F.Supp. 545, 546 (D.Minn.1969); *Citizens Bank, Drumright v. Satcher,* 521 P.2d 819, 821 (Okla.1974). By way of example, we note the following items which have been held to be "assets": "logos, credit and goodwill," *Brennan v. Sindicato Empleados de Equipo Pesado, Etc.,* 370 F.Supp. 872, 879 (D.P.R.1974); "patents," *Dairy Foods Inc. v. Farmers Co-Operative Creamery,* 298 F.Supp. 774, 777 (D.Minn.1969); "accounts receivable," *Spagnola v. Iowa Employment Security Commission,* 237 Iowa 645, 647, 23 N.W.2d 433, 435 (1946); "leasehold interests," *Martin v. Stires,* 171 S.W. 836, 838 (Tex.Civ. App.1914).

Appellant's theory is that appellee appropriated a corporate asset by using the wording which appellant paid its counsel to prepare. The appropriation claimed is not the taking of tangible pieces of paper, but rather of the knowledge or words contained in or imprinted on the paper. The same problem would be presented if the employee had memorized the words of the contract and had then dictated the forms after leaving employment.

■■ We recognize that knowledge may be protected property in the form of a trade secret, but the knowledge here is not of that nature. Although the sales contract was prepared specially for appellant, it contained no concepts or ideas which are not in the public domain. "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Wright v. Palmer,* 11 Ariz.App. 292, 295, 464 P.2d 363, 366 (1970).

Further, appellant cites no authority, and our independent research reveals none, establishing that use of the wording in a corporation's sales documents constitutes an actionable misappropriation of corporate assets by a prior officer or director of the corporation where such documents are not protected by copyright, where no contract between the corporation and the director restricted the latter's use of such docu-

**500**

ments, where the director did not come upon the documents by any wrongful means, and where no injury to the corporation is shown to have resulted from the director's use of the documents.

Viewed in this light, we must affirm the court below. An employee does not become liable for actionable appropriation of a corporate asset simply because in his new job he uses knowledge which he got in his old job. *See Wright v. Palmer*, 11 Ariz.App. at 296, 464 P.2d at 367. Knowledge, as such, is not synonymous with the term "asset."

### LOSS OF GOOD WILL

Rovinsky testified that Backman's conduct resulted in loss of good will to appellant. Rovinsky valued the damage to the corporation at $5,000. In support of this allegation, Rovinsky stated that appellant could not follow up on its clients because Backman refused to turn over necessary documents in his possession. Backman acknowledged that Rovinsky had requested documents from him and that he had asked Rovinsky to specify what documents he needed, but stated that Rovinsky never responded to this request. Rovinsky also alleged that he had received a complaint from one client that Backman had not given him the quality of recording that was represented to him.

We recognize that the loss of good will to a corporation need not be proved with mathematical precision, and that only the best possible evidence of damages is required. *Atkinson v. Marquart*, 112 Ariz. 304, 306, 541 P.2d 556, 558 (1975). We also acknowledge that Rovinsky, as an officer of appellant, could testify regarding the alleged loss of good will to appellant. *Id.* at 307, 541 P.2d at 559. Nevertheless, in light of the record before us we cannot say the trial court's presumptive finding that appellant did not suffer loss of good will due to Backman's actions was error. The record reveals that soon after Backman's departure appellant employed a substitute for Backman and that the new employee was able to continue the sales operations and generate profit for appellant. It is also

noteworthy that Backman's tenure with appellant lasted only one month, and, therefore, the trial court might well have found that appellant's calculations of its alleged damages due to Backman's actions were too speculative.

The judgment of the trial court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.