231 P.3d 921

**TASER INTERNATIONAL, INC.,
a Delaware corporation,
Plaintiff/Appellee,**

v.

**Steve WARD, an individual,
Defendant/Appellant.**

**No. 1 CA–CV 09–0468.**

Court of Appeals of Arizona,
Division 1, Department A.

May 13, 2010.

Bacal Law Group by Glenn S. Bacal, David M. Andersen, Scottsdale, and Stafford Frey Cooper by Theron (Ted) Buck, pro hac vice, Seattle, WA, Attorneys for Defendant/Appellant.

Taser International, Inc. by Holly Gibeaut, Scottsdale, and Barnes & Thornburg LLP by John R. Maley, pro hac vice, Kathleen M. Anderson, pro hac vice, Indianapolis, IN, Attorneys for Plaintiff/Appellee.

## OPINION

PORTLEY, Judge.

¶ 1 Defendant Steve Ward appeals from the entry of partial summary judgment in favor of Plaintiff Taser International. He argues that partial summary judgment should be entered in his favor, or, alternatively, that issues of material fact preclude summary judgment in favor of Taser. For the following reasons, we reverse the entry of partial summary judgment, direct entry of summary judgment in part in favor of Ward, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Taser International develops and manufactures electronic control devices, commonly called stun guns, and accessories for electronic control devices, including a personal video and audio recording device called TASER CAM. Taser sells its products to the military, law enforcement, corrections, private security, and the general public.

¶ 3 Ward was employed full-time with Taser from January 1, 2004, to July 24, 2007, and served as Taser's vice-president of marketing during the time relevant to this appeal.[1] He was an at-will employee, and he did not sign any employment contract, noncompete agreement, or non-disclosure agreement.

---

1. He also served as Taser's vice-president of in-    ternational sales.

¶ 4 During his employment, Ward was privy to some of Taser's confidential information, trade secrets, and other intellectual property. As a member of Taser's Vital Factors Team he participated with company executives and other vice-presidents in considering new product ideas and concepts, product failure rates, product strategies, operational issues, and marketing programs.

¶ 5 In December 2006, Ward began exploring whether he could personally develop the concept of an eyeglass-mounted camera. He sought legal advice about whether he could permissibly develop such a camera independent of Taser, and hired patent counsel to conduct a patent search on the idea.

¶ 6 Between April 2007, and his resignation approximately four months later, Ward shifted his exploration to the concept of a clip-on camera device after learning that the eyeglass-mounted concept was already patent protected. He directed patent counsel to conduct a patent search on the modified idea.[2] He communicated with JAM–Proactive, a product development company, about the design and development of a clip-on camera device,[3] and he received a detailed product development proposal from JAM–Proactive on June 12, 2007. Prior to his resignation, Ward planned to leave Taser to form a new business, and completed substantial work on a business plan to develop, market, and sell a clip-on camera device.[4]

¶ 7 Ward resigned on July 24, 2007. He never disclosed to Taser his future business plans or his intentions to continue working on the clip-on camera device. He formed Vievu LLC on August 23, 2007, and Vievu now markets a clip-on camera device to general consumers and law enforcement. Ten months after Ward resigned, Taser announced the AXON, a product that provides an audio-video record of an incident from the visual perspective of the person involved.[5]

¶ 8 Taser filed suit against Ward on October 22, 2007, and asserted claims for misappropriation of trade secrets, breach of the duty of loyalty, tortious interference with contract, breach of contract, breach of fiduciary duty, conversion, and unjust enrichment. The breach of the duty of loyalty and fiduciary duty claims were based on allegations that, while employed with Taser, Ward was "working on [a] Personal Video and Audio Recording Product for [his] own account and with a view toward exploiting this work for [his] own personal gain in competition with TASER." Taser also alleged that Ward "diverted and misdirected certain aspects of new product development of TASER ... with intent to compete with TASER and to obtain an improper competitive advantage against TASER at such time as he left TA-

2. During oral argument before the trial court, Taser argued that Ward had acquired intellectual property related to his efforts. However, beyond his directing patent counsel to conduct patent searches, Taser presented no evidence that Ward applied for a patent or otherwise took steps to procure intellectual property rights in the clip-on camera.

3. In his initial business plan, released after his resignation, Ward indicated that his new enterprise, Vievu, was "utilizing JAM–Proactive ... to design the camera." Taser argued that this indicates that "[w]hile still a senior executive at TASER ..., Ward retained JAM–Proactive to design electronics for his rival product." It is unclear, however, whether Ward in fact retained the services of JAM–Proactive before, or after, he resigned from Taser. In respect to Taser's motion for summary judgment, we must draw all reasonable inferences in favor of Ward. See Andrews v. Blake, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003).

4. In the reply in support of its motion for summary judgment, Taser stated that Ward "pre-

registered to launch [his] product at [a] [2008] Consumer Electronics Show, a process that necessarily would have been accomplished before Ward resigned." Taser cites only to the report of expert Dan Dalton, in which Mr. Dalton stated that Ward would have had to register well in advance of the 2008 show in order to participate, and concludes that Ward must have registered while still employed. Taser, however, presented no evidence that Ward registered for the 2008 show while employed at Taser. Additionally, Mr. Dalton's statements were not included in Taser's statements of fact filed in the trial court. Ward did not have an opportunity to object or offer contradictory evidence on the matter, and the trial court did not consider Dalton's statement.

5. Taser described the AXON as a "tactical networkable computer" and as a "state of the art audio-video earpiece with imager, speaker, and microphone [that] integrates into the communication loop between existing radios and the [officer's] communications headset."

SER's employment."[6] Ward answered and asserted counterclaims for tortious interference with contractual relations, tortious interference with business expectancy, and abuse of process.

¶ 9 Taser moved for partial summary judgment on the liability aspect of the breach of the duty of loyalty and fiduciary duty claims. Ward responded with a cross-motion on those claims. After oral argument, the trial court concluded that "there [was] no genuine issue of material fact ..., that Defendant Ward owed a duty of loyalty to Taser and had a fiduciary duty to Taser[,] and that he breached and violated [those] duties." Consequently, the court granted Taser's motion and denied Ward's cross-motion. The court subsequently entered judgment with Arizona Rule of Civil Procedure 54(b) language.

¶ 10 Ward appeals, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12–120.21 and –2101(G) (2003).

## DISCUSSION

¶ 11 Ward argues that the trial court erred by granting Taser summary judgment on the liability aspect of the breach of the duty of loyalty and fiduciary duty claims. He contends that summary judgment should have been entered in his favor.

¶ 12 We review a grant of summary judgment de novo and view the facts in the light most favorable to the non-moving party. *Andrews*, 205 Ariz. at 240, ¶ 12, 69 P.3d at 11. A court may grant summary judgment "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). The determination of whether a genuine issue of material fact exists is based on the record made in the trial court.[7] *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 292, 877 P.2d 1345, 1348 (App.1994). Summary judgment is not intended to resolve factual disputes and is inappropriate if the court must determine the credibility of witnesses, weigh the quality of evidence, or choose among competing inferences. *Orme School v. Reeves*, 166 Ariz. 301, 308–09, 802 P.2d 1000, 1007–08 (1990); *State Comp. Fund v. Yellow Cab Co.*, 197 Ariz. 120, 123, ¶ 11, 3 P.3d 1040, 1043 (App.1999).

¶ 13 In its motion, Taser raised the following theories to support its claims: (1) Ward engaged in direct competition with Taser prior to his resignation; (2) he improperly used Taser's materials and confidential information; (3) he usurped Taser's corporate opportunity in a "second generation on-officer audio and video recording device building from the TASER CAM"; and (4) he failed to inform Taser that he planned to form a competing business. Because the trial court simply granted judgment to Taser on its duty of loyalty and fiduciary duty claims, we review each of the legal theories de novo. *See CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, 198 Ariz. 173, 178, ¶ 19, 7 P.3d 979, 984 (App.2000) (stating that we consider only the arguments, theories, and facts properly presented to the trial court).

¶ 14 To the extent that we reverse the grant of summary judgment on any legal theory, we are authorized to direct judgment

---

6. During oral argument in the trial court, Taser conceded that the duty of loyalty and fiduciary duty claims "overlap." Each claim is predicated on nearly identical allegations, and Taser makes no attempt to differentiate the claims or explain whether its legal theories fall under one or both claims.

7. In addition to its motion for partial summary judgment and statement of facts, Taser subsequently filed a supplemental memorandum supporting its motion and a supplemental appendix of evidence. Ward moved to strike certain of Taser's supplemental evidentiary submissions and lodged numerous objections to Taser's original statement of facts. The court did not rule on the motion or objections. We assume it considered the evidence, *see Bowart v. Bowart*, 128 Ariz. 331, 336, 625 P.2d 920, 925 (App.1980), and deem that the court denied the motion and objections, *see State v. Hill*, 174 Ariz. 313, 323, 848 P.2d 1375, 1385 (1993) (stating that when a court fails to rule on a motion, it is deemed denied).

On appeal, Ward argues that the trial court erred when it failed to rule on his motion and evidentiary objections. Because reversal is warranted on other grounds, however, we will not address his argument.

for a party filing a cross-motion with identical issues that can be decided as a matter of law.[8] *Roosevelt Sav. Bank v. State Farm Fire & Cas. Co.*, 27 Ariz.App. 522, 526, 556 P.2d 823, 827 (1976); *see also* Ariz. R. Civ. P. 56(b) (stating that a defending party may be granted summary judgment on a claim "or any part thereof"); Fed.R.Civ.P. 56 (stating that summary judgment can be granted on "all or part of [a] claim").

## A. Duty Not to Compete

■ ¶ 15 "[I]n Arizona, an employee/agent owes his or her employer/principal a fiduciary duty." *McCallister Co. v. Kastella*, 170 Ariz. 455, 457, 825 P.2d 980, 982 (App. 1992). "[I]t is too plain to need discussion that an agent is under the duty to act with entire good faith and loyalty for the furtherance of the interests of his principal in all matters concerning or affecting the subject of his agency, and if he fails to do so[,] he is responsible to his principal for any loss resulting therefrom." *Thomas v. Newcomb*, 26 Ariz. 47, 51, 221 P. 226, 228 (1923).[9]

■ ¶ 16 One aspect of this broad principle is that an employee is precluded from actively competing with his or her employer during the period of employment. *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 492, ¶ 53, 200 P.3d 977, 989 (App.2008); *see also* Restatement (Third) of Agency § 8.04 (2006) ("Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal . . . ."). Following the termination of the employment relationship, however, in the absence of an enforceable non-compete agreement, a former employee is free to compete. *McCallister*, 170 Ariz. at 457–58, 825 P.2d at 982–83; Restatement (Third) of Agency § 8.04 cmt. b, c.

■ ¶ 17 Although an employee may not compete prior to termination, "[the employee] may take action [during employment], not otherwise wrongful, to prepare for competition following termination of the agency relationship."[10] Restatement (Third) of Agency § 8.04. Preparation cannot take the form of "acts in direct competition with the employer's business." *McCallister*, 170 Ariz. at 457–58, 825 P.2d at 982–83.

■ ¶ 18 "The line separating mere preparation from active competition may be difficult to discern in some cases," and we must "focus on the nature of the defendant's preparations to compete." *Sec. Title Agency*, 219 Ariz. at 492, ¶ 54, 200 P.3d at 989 (quotation omitted); *see also* Restatement (Third) of Agency § 8.04 cmt. c ("In retrospect it may prove difficult to assess the propriety of a former agent's conduct because many actions may be proper or improper, depending on . . . the surrounding circumstances. For that reason it may be difficult to draw a clean distinction between actions prior to termination of an agency relationship that constitute mere preparation for competition, which do not contravene an employee's or other agent's duty to the principal, and actions that constitute competition."). "[T]he ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case." *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 570 (1978).

¶ 19 Here, it is undisputed that Ward was not bound by any employment contract or covenant not to compete with Taser. Thus, Ward was free to make reasonable preparations to compete while still employed, and to

---

**8.** Generally, the denial of a motion for summary judgment is not appealable. *Callan v. Bernini*, 213 Ariz. 257, 258, ¶ 2, 141 P.3d 737, 738 (App. 2006).

**9.** While employed as the vice-president of marketing and vice-president of international sales, Ward's responsibilities included management of marketing campaigns and strategies, developing marketing plans, developing and implementing sales channel strategies in international markets, management of Taser personnel, developing operating budgets, managing financial performance and budgets, hiring and training of sales employees, and coordinating export and import activities. Taser presents no evidence or argument that Ward was derelict in the performance of these responsibilities.

**10.** We independently review whether Ward's actions were "otherwise wrongful." *See infra* Parts B and C.

actively compete after his resignation. We review, however, whether Ward's actions were more than mere preparations or constituted unfair competition.

¶ 20 It is undisputed that, prior to his resignation, Ward did not solicit or recruit any Taser employees, distributors, customers, or vendors; he did not buy, sell, or incorporate any business; he did not acquire office space or other general business services; he did not contact or enter into any agreements with suppliers or manufacturers for his proposed clip-on camera; and he did not sell any products. However, Ward did begin developing a business plan, counseled with several attorneys, explored and abandoned the concept of an eyeglass-mounted camera device, and engaged, to some extent, in the exploration and development of a clip-on camera device.[11]

¶ 21 Ward argues that his pre-termination activities did not constitute active competition, but were merely lawful preparation for a future business venture. Taser contends, however, that "[t]his case is not about just investigating computer software, acquiring a line of credit, securing office space, or getting prices on telephones [,] ... [but] about developing a rival design during employment, knowing full well TASER has sold such a device and continues to develop a second generation product." [12]

▉ ¶ 22 Upon review, we agree with Ward that certain of his pre-termination activities are qualitatively different than "direct competition" and cannot form the basis for liability. Ward's partial development of a business plan did not compete with any of Taser's business activities, no matter the level of included detail. A business plan, by its very nature, is only a plan, and without implementation, cannot independently consti-

tute disloyal competition. Similarly, Ward's interactions with attorneys for purposes of obtaining legal advice and to research existing patents do not constitute direct competition with Taser. *See Fitness Experience, Inc. v. TFC Fitness Equip., Inc.,* 355 F.Supp.2d 877, 893 (N.D.Ohio 2004) (granting summary judgment against a breach of fiduciary duty claim where the defendants met with lawyers to plan a competing business because the activities constituted preparation to compete, not active competition). On the record before us, Ward's contact with attorneys was manifestly done to investigate his ability to design and possibly develop a camera device and did not constitute competition with Taser. Moreover, Taser did not present any evidence that Ward took steps during his employment to procure any intellectual property rights adverse to Taser or its interests.

▉ ¶ 23 Similarly, under the circumstances of this case, any preliminary research and development efforts aimed at assessing the possibility of developing a camera device did not constitute direct competition with Taser. There is no evidence that Ward's activities with the eyeglass-mounted camera concept went beyond preliminary investigation. Consequently, Ward's preliminary research into the eyeglass-mounted camera concept, which he later abandoned, cannot constitute a breach of his duty of loyalty. Additionally, any preliminary research conducted by Ward into the development of the clip-on camera device, including seeking a product design *proposal,* was distinctly preparatory and not direct competition with Taser. *See Maryland Metals,* 382 A.2d at 571 (holding that two employees' conduct was "manifestly preparatory in nature" where they "contacted and consulted with various municipal agencies, utility companies, con-

---

**11.** Although Ward participated in high-level executive meetings at Taser, he was not responsible for product conception, design, or development at the company. In support of its motion, Taser cites to *Daniel Orifice Fitting Co. v. Whalen,* 198 Cal.App.2d 791, 18 Cal.Rptr. 659 (1962), for the proposition that it is a breach of an employee's fiduciary duty to not turn over design work accomplished during one's employment. Unlike this case, however, the employee in *Whalen* was an engineer employed specifically to design improvements to his employer's products and had a

duty to perform those tasks for the benefit of his employer. *Id.* at 665–66. Because Ward was not employed to design or develop products for Taser, *Whalen* is inapposite.

**12.** In its motion for summary judgment, Taser argues that Ward actively competed during his employment. However, Taser also takes the contrary position at times that Ward only "planned a competing business" and "laid the groundwork to compete" while at Taser.

struction contractors, manufacturers and engineers concerning [a future business] and the purchase of equipment necessary to operate and maintain the ... business").

■ ¶ 24 However, assuming Taser was engaged in the research and development of a recording device during Ward's employment, assuming Ward knew or should have known of those efforts, *see W. Med. Consultants, Inc. v. Johnson*, 80 F.3d 1331, 1335–37 (9th Cir.1996) (interpreting a noncompetition clause to be violated if a former employee "knew or should have known" of a former employer's business intentions and competed with those plans), and assuming Taser's device would compete with Ward's concept,[13] substantial design and development efforts by Ward during his employment would constitute direct competition with the business activities of Taser and would violate his duty of loyalty. In the context of a business which engages in research, design, development, manufacture, and marketing of products, we cannot limit "competition" to just actual sales of competing products.

¶ 25 Summary judgment on this theory is nevertheless improper because a genuine issue of material fact exists as to the extent of Ward's pre-termination design and development efforts. In support of the conclusion that Ward actively competed prior to his resignation, Taser submitted evidence which indicated that he engaged in pre-termination communications with staff at JAM–Proactive and received its design proposal before his resignation. Taser also provides a version of Ward's business plan, completed after his resignation in July 2007, and an August 2007 Vievu company valuation. In the business plan, Ward states that "VieVU is in Phase 3 of the design of their camera system" and that it is "utilizing JAM–Proactive, a proven design company for electronics, to design the camera." In the Vievu company valuation, Ward stated that, "[t]he VieVU camera is

well into development design stage 4 (out of 6)."

¶ 26 Based upon the evidence, a reasonable jury could infer that "Phase 3" and "stage 4" represent substantial design and development efforts, and that these efforts occurred during Ward's employment. However, a reasonable jury could also conclude that Ward's statements were mere puffery and that he had only explored options with JAM–Proactive and did not engage in substantial development efforts until after his resignation. Summary judgment is not intended to resolve factual disputes and is inappropriate if the court must weigh the quality of evidence or choose among competing inferences. *State Comp. Fund*, 197 Ariz. at 123, ¶ 11, 3 P.3d at 1043. Because genuine issues of fact exist, summary judgment on this theory of liability is not warranted for either party.

## B. Use of Taser Resources and Confidential Information

¶ 27 Although an employee may, absent a non-compete covenant, compete with a former employer or prepare to compete with a current employer, "the tactics that an agent may use ... are subject to legal limits." Restatement (Third) of Agency § 8.04 cmt. b. Specifically, "[a]n agent has a duty (1) not to use property of the principal for the agent's own purposes ...; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." Restatement (Third) of Agency § 8.05.

¶ 28 Taser argues that Ward both performed his pretermination camera-development efforts on company time and with company resources, and used proprietary information in developing his clip-on camera device and business.

## 1. Improper Use of Taser Resources

■ ¶ 29 We find no evidence in the record demonstrating that Ward used Taser's

---

**13.** The parties vigorously dispute whether Taser planned to or was engaged in the research and development of a competing device while Ward was employed, and, if so, whether Ward was aware of any such plans or efforts. Additionally, in its filings with the trial court and on appeal, Taser makes no attempt to compare TASER CAM

or TASER AXON with Ward's device. Rather, Taser merely concludes that Ward's device would compete with Taser's products based on statements in Ward's initial business plan. Because other questions of fact dictate reversal, however, we need not decide whether there are genuine issues of material fact in these respects.

time, facilities, or resources in his pre-termination camera-development efforts. In its statements of fact, Taser stated that "Ward used his laptop in developing [his] company." To support its statement, Taser cited to a portion of the deposition of Amy Pich, Ward's girlfriend. That portion, however, was not provided to the court, and our review of the evidence discloses no alternative support for the statement. Therefore, even if "his laptop" referred to Taser property, the proffered evidence is insufficient to establish that Ward used Taser resources.

¶ 30 Similarly, Taser attempted to demonstrate that Ward corresponded with several attorneys about his camera-development efforts while on company time by producing a privilege log showing the dates on which numerous emails were sent between Ward and his attorneys between December 2006 and August 2007. Even assuming that the correspondence was related to Ward's pre-termination camera-development efforts, and assuming the privilege log is admissible evidence, the exhibit does not indicate the precise times at which Ward sent his email correspondence.[14] Although the evidence indicated that Ward corresponded with various attorneys prior to his resignation, it does not establish that Ward did so on company time. Therefore, summary judgment in favor of Taser on this theory is inappropriate.[15] Similarly, because we reverse based on questions of fact, we decline to direct judgment in favor of Ward on this theory. *See Roosevelt Sav. Bank*, 27 Ariz.App. at 526, 556 P.2d at 827.

## 2. Improper Use of Confidential Information

¶ 31 "An agent's relationship with a principal may result in the agent learning information ... that the agent should reasonably understand the principal expects the agent to keep confidential." Restatement (Third) of Agency § 8.05 cmt. c. The duty of confidentiality "extends to all such information concerning a principal even when it is not otherwise connected with the subject matter of the agency relationship," and "do[es] not end when the agency relationship terminates." *Id.* However, "[a] former agent may use skills and more general knowledge, although learned in the course of work done for the former principal," in the course of competition. Restatement (Third) of Agency § 8.04 cmt. c; *see also Amex Distrib. Co. v. Mascari*, 150 Ariz. 510, 516, 724 P.2d 596, 602 (App.1986) ("One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience.") (quoting *ILG Indus., Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971)).

¶ 32 Although it is undisputed that Ward was exposed to certain trade secrets and other confidential information, and retained notes taken during Taser strategy sessions,[16] there is a genuine issue of material fact whether he used any such information in the development of his product or operation of his business.[17] In his declaration,

14. Although the actual privilege log does not contain evidence of what specific times correspondence was sent, Taser provided a second exhibit that purportedly summarized the information in the privilege log, and contains exact times that correspondence was allegedly sent. We decline, however, to consider any information included in the summary that was not evident in the actual privilege log.

15. In his declaration, Ward states that: (1) "[a]t no time during [his] employment ... did [he] use TASER's time, facilities, or resources in making preparations to form and operate VIEVU" and (2) he "used only [his] personal laptop ... and not Taser's computers, in making preparations to form and operate VIEVU." Therefore, even if Taser had presented evidence indicating that Ward used a company computer or used company time to advance his personal interests, summary judgment would nevertheless be improper

because we may not assess credibility or weigh the evidence at summary judgment.

16. Taser argues that Ward violated his duty of loyalty when he "secret[ed] away notes and other items marked confidential relating to product concepts and discussions." Although Taser presents evidence that Ward retained certain notes and documents after his resignation, there is no evidence that Ward did so "secretly" or otherwise acted to harm Taser. Drawing all reasonable inferences in favor of Ward, we conclude that the mere fact that Ward retained certain documents, without more, is insufficient to merit summary judgment.

17. Taser presented evidence that Ward retained a copy of its non disclosure agreement, substituted Vievu's name for Taser's in the document, and is using it. Taser contends that Vievu's use of

Ward states that, "[he is] unaware of any information or technology exclusive to TASER that can be found in VIEVU products." He also testified that "VIEVU's product is comprised of readily available off-the-shelf internal components ... as well as custom-designed software and casing, all of which are unassociated with and wholly dissimilar to TASER's products." Taser would have us infer that Ward must have used its proprietary information in his business and design efforts. Taser, however, provides no evidence of the specific confidential information it contends was *used* by Ward, as opposed to information to which Ward was simply exposed.[18] Viewing the evidence in the light most favorable to Ward, and drawing all reasonable inferences in his favor, a reasonable jury could find that Ward did not use any proprietary information belonging to Taser in the development of his clip-on camera device or the operation of his business.[19] Therefore, summary judgment on this theory was not appropriate. Because genuine issues of material fact exist, we decline to direct entry of summary judgment in favor of Ward.

## C.  Corporate Opportunity

¶ 33 The corporate opportunity doctrine "prohibits fiduciary usurpation of a corporate opportunity." *AMERCO v. Shoen,*

184 Ariz. 150, 158, 907 P.2d 536, 544 (App. 1995); *Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 122, 412 P.2d 47, 57 (1966) (searching the record to determine whether the defendant "wrongfully deprived" the plaintiff of a business opportunity).[20]

¶ 34 Taser argues that Ward usurped its corporate opportunity in a second-generation personal video and audio recording product. During oral argument before the trial court, Taser argued that, because it was the market leader in "recording the truth," both an eyeglass-mounted recording device and any other on-officer recording device are its corporate opportunities. Taser reasserted its position during oral argument on appeal. Ward argues, however, that "the publicly available idea of a wearable camera ... is ... not a 'corporate opportunity' capable of being 'usurped,'" and that this "is not a situation in which Ward was presented with an opportunity to purchase some asset or to enter into some deal, contract, or other transaction that he stole from TASER." He contends that Taser "cannot claim the universe of all cameras used by law enforcement as Taser's own personal corporate opportunity, thereby precluding any former employee from competing in any way in that space."

¶ 35 The record does not support Taser's charge that Ward "wrongfully deprived" it of

the document constitutes an actionable misappropriation of Taser's proprietary assets. However, it is unclear whether the document contains any concepts or ideas which are not in the public domain. "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Master Records, Inc. v. Backman,* 133 Ariz. 494, 499, 652 P.2d 1017, 1022 (1982) (quoting *Wright v. Palmer,* 11 Ariz.App. 292, 295, 464 P.2d 363, 366 (1970)).

18.  To the extent that Taser points to specific information that Ward was exposed to at Taser, there is nevertheless a question of fact whether the information was proprietary or consisted of general knowledge learned in the course of his employment, and, if it was proprietary, whether it was actually used by Ward.

19.  The trial court similarly denied a motion for summary judgment on Taser's misappropriation of trade secrets claim and concluded that "there [was] a genuine issue of material fact as to whether or not a relevant and legally recogniz-

able trade secret existed and whether or not Defendant misappropriated or converted such a trade secret for Defendant's own use."

20.  Arizona courts have adopted a somewhat narrow view of the corporate opportunity doctrine. In *Tovrea,* our supreme court recounted the general proposition "that a director or officer may not seize for himself, to the detriment of his company, business opportunities in the company's line of activities in which it has an interest or prior claim." 100 Ariz. at 122, 412 P.2d at 57. The court held, however,

The general statement of the doctrine is too broad because there is much activity lying outside the duty of [a] director but within the scope of the corporation's business. The more precise test is whether the director has a specific duty to act in regard to the particular matter as a representative of the company. If there is no such duty, the director may acquire outside interests although the corporation may be more or less interested.
*Id.*

any business opportunities. Taser does not argue that Ward usurped any concrete opportunity to purchase goods, services, or property, or to enter into some contract or other business transaction. Rather, Taser argues only that Ward took its opportunity to develop a second-generation recording device. Taser's success in developing, marketing, and selling its newly-released TASER AXON, the product it contends resulted from its early interest in developing a second-generation recording device, belies its argument. Taser presented no evidence that Ward divested it of any concrete opportunity that Ward learned of while a Taser employee. Had Ward learned of a potential partnership with a sunglasses manufacturer, for example, to develop an eyeglass-mounted camera, or learned of a specific prospective client's interest in purchasing a clip-on camera, and taken those opportunities for himself without proper disclosure, the corporate opportunity doctrine would be implicated. Taser, however, argued only that Ward usurped its opportunity in a second-generation personal video and audio recording product without any explanation of what precise opportunity Ward usurped.[21]

¶ 36 If the corporate opportunity doctrine is extended to all possible business ideas discussed, or learned about in the course of employment, even ideas present in the public domain, such extension would have the effect of unnecessarily restraining competition by precluding former employees from ever developing competing products based on ideas that may have once been briefly discussed or abstractly contemplated by a former employer, or even products in the same line of business. Former employees of Taser would effectively be precluded from ever competing with Taser in any line of business remotely

connected to the concepts discussed by Taser unless they disclosed their intentions and received the unlikely approval to proceed with the idea. For at-will employees, this would effectively transform their employment relationship to one bound by a de facto non-compete agreement. For Ward, it would effectively preclude him from developing and selling any form of a wearable camera device, no matter its complexity or what features it possessed, even if the idea was clearly in the public domain[22] and was being developed by other businesses.[23] We decline to extend the doctrine this far. Even assuming Ward directly competed with Taser during his employment, and misappropriated trade secrets or confidential information, we cannot see how his actions deprived Taser of, or adversely affected, its opportunity to develop a second-generation recording device. Therefore, summary judgment on this theory in favor of Taser is inappropriate.

¶ 37 Similarly, because there are no genuine issues of material fact relevant to this theory, and because Ward is entitled to judgment as a matter of law based on the record, we direct entry of summary judgment on this theory in his favor. *See Roosevelt Sav. Bank,* 27 Ariz.App. at 526, 556 P.2d at 827.

### D. Disclosure of Intent to Compete

¶ 38 In its motion for summary judgment, Taser argued that Ward violated his fiduciary duties by failing to inform Taser that he "planned to form a competing business." Ward contends that "under clear legal authority, [he] had no duty to disclose his plans to leave and form VIEVU." We agree.

¶ 39 "In general, an employee or other agent who plans to compete with the principal does not have a duty to disclose this fact

---

**21.** At oral argument on appeal, Taser argued that Ward usurped its opportunity to take advantage of 2007 end-of-year law enforcement purchasing. Taser, however, did not present any evidence that it lost the opportunity to sell one of its products to law enforcement or that Ward sold his clip-on camera to law enforcement.

**22.** Ward testified and presented evidence that "[s]cores of cameras that can be mounted on people and apparel have been widely available on the market for years."

**23.** In an August 2006 strategic meeting involving Ward, the concepts of "cameras mount[ed] on anything," "adventure gear," "IED prevention," "perimeter border fencing," and "streaming video" were discussed. Taser's conception of the corporate opportunity doctrine would have the effect of precluding Ward from developing a product pertaining to any of the discussed concepts because Ward heard discussions of them while employed by Taser, and therefore they are exclusively Taser's corporate opportunities to explore and develop.

**400**

to the principal." Restatement (Third) of Agency § 8.04 cmt. c; *see also Johnson,* 80 F.3d at 1336; *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 201 (Tex.2002) ("An at-will employee may properly plan to go into competition with his employer" and "[the] employee has no general duty to disclose his plans to his employer. . . ."). To require employees to divulge such information to their employers "would create an undesirable impediment to free competition in the commercial and industrial sectors of our economy." *Maryland Metals,* 382 A.2d at 573. Therefore, to the extent that Taser contends that Ward had a duty to disclose his plans to form a competing business, we reverse summary judgment and direct entry of judgment in this respect to Ward. *See Roosevelt Sav. Bank,* 27 Ariz.App. at 526, 556 P.2d at 827.

¶ 40 However, to the extent that Ward's pre-termination development efforts constituted competition, rather than merely preparations to compete, or involved the use of proprietary information, he had a duty to disclose his activities to Taser. *See* Restatement (Second) of Agency § 381 cmt. d (1958); *United States v. Betts,* 511 F.3d 872, 874–75 (9th Cir.2007) ("An employee's duty of loyalty includes a duty to . . . avoid undisclosed interests that might affect his conduct as an employee."). Because there are genuine issues of material fact as to whether Ward used proprietary information or competed with Taser during his employment, summary judgment is inappropriate for either party on the theory that he violated a duty to disclose his activities to Taser.

### CONCLUSION

¶ 41 For the foregoing reasons, we reverse the grant of summary judgment entered in favor of Taser, direct entry of summary judgment in part in favor of Ward, and remand for further proceedings.

CONCURRING: LAWRENCE F. WINTHROP, and MARGARET H. DOWNIE, Judges.